## BOLLING *v.* STATE.

Decided June 20, 1891.

1. *Felony trial—Presence of defendant.*
   The recognizance of witnesses in a felony case may be taken in the defendant's absence.

2. *Homicide—Evidence.*
   Upon a trial for murder, in which the defense of insanity is made, evidence is admissible that defendant, a few weeks before the killing, bought a gun and practiced shooting it; also that, more than two years before the killing, he wrote to deceased's daughter, asking to escort her to an entertainment, and that she declined—it being further shown that recently before as well as after the killing defendant had referred to the incident with apparent ill-feeling.

3. *Insanity—Right to open and close.*
   In a prosecution for murder the defendant cannot, by a plea which admits the killing but alleges insanity as a defense, shift the burden of proof so as to entitle him to the right to open and close the argument.

4. *Insanity—Evidence—Opinion.*
   Upon the defense of insanity to a prosecution for murder, evidence is admissible in defendant's favor as to his subsequent conduct or language when so connected with evidence of previous mental weakness as to establish its existence at the time of the murder, or when indicating unsoundness of so permanent a nature as to have required a longer period than the interval for its development; based upon such testimony, the witness may give his opinion with reference to sanity generally or to any monomania to which the evidence points.

5. *Moral insanity—Irresistible impulse.*
   It is no defense to a crime committed by a sane person that it was done under the influence of an irresistible impulse.

6. *Rule as to insane delusion.*
   The existence of an insane delusion is a defense in a criminal case only when the imaginary state of facts, if real, would justify or excuse the crime.

7. *Burden of proof.*
   The rule in *Casat* v. *State,* 40 Ark., 523, that the burden is upon the defendant to prove insanity by a preponderance of the evidence, is adhered to.

APPEAL from *Logan* Circuit Court.

HUGH F. THOMASON, Judge.

*Oscar L. Miles* for appellant.

1. It was error to refuse defendant the right to open and close. There was only one issue for the jury, the *insanity* of defendant. The *burden* was on him to establish it, and hence he was entitled to open and close.

2. Defendant was not present when certain *substantive* steps were taken. Mansf. Dig., secs. 2098, 2213; Max. Cr. Pr., 561; 24 Ark., 627; *ib.*, 629; 44 *id.*, 331; 45 *id.*, 165; 50 *id.*, 492.

3. The court erred in admitting the irrelevant testimony of Hedges and others. Whart. Cr. Ev., sec. 29; *ib.*, 23 *et seq.;* 92 U. S., 284.

See also 51 Ark., 157; 43 *id.*, 294.

4. It was error to exclude the questions (1 and 2) asked the witness A. Hedges. The "child test," the "wild beast test," the test of "knowledge of right and wrong generally," have been put away, and the courts now hold that if accused did "not know right from wrong with respect to the particular act he was committing," he is no more responsible than if he had not done the deed. 10 Cl. & Fin., 200; 7 Metc., 500; 50 Ark., 517; 12 Mo., 223.

5. The charge was objectionable because no definition of murder in the second degree was given, and none as to reasonable doubt; nothing as to *partial* insanity or *insane delusions.* The sixth was good as far as it went, but was incomplete. 50 Ark., 517. The seventh was argumentative and erroneous because it undertook to tell the jury when defendant's plea of insanity had failed—a matter to be determined by them. 49 Ark., 148, 440. Its latter clause is not the law. In support of prayer first of defendant, see Sackett's Inst. to Juries, 699; and as to the second, third, fourth, see respectively *ib.*, 698-9, and 50 Ark., 511. The ruling of this court in Casat's case, reaffirmed in Coats' case, is opposed to the reasoning in 31 Ill., 385, which is to our mind unanswerable. As to the seventh, eighth, ninth, tenth, eleventh and twelfth, see Elwell's Insanity, 390; 10 Ohio St., 598; 10 Fed. Rep., 161; 63 Ala., 307.

*W. E. Atkinson*, Attorney General, for appellee.

1. The burden was not shifted from the State by defendant's plea of insanity. It was at last only a plea of not guilty. Mansf. Dig., sec. 2172; Bish., Cr. Pro., sec. 699.

2. It is too late after verdict to complain that he was not present when the grand jury was empaneled or the indictment quashed. 12 Ark., 630; 50 *id.*, 497. The other objections were not substantive steps. 45 Ark., 165; *State v. Elkins*, 63 Mo.

3. The evidence objected to tended to show a grievance against Parks, dating from the refusal of Parks' daughter to accompany defendant to the show. The evidence tends to sustain a " pertinent hypothesis."

4. Opinions of non-expert witnesses are admissible only when *all the facts* upon which the opinion is based are detailed before the jury. Bish., Cr. Pro., 3d ed., sec. 679; 5 Blackf. (Ind.), 217; 4 Conn., 203; 56 N. H., 227.

5. The instructions as to insane delusions are taken from 40 Ark., 511, and 50 *id.*, 511. The sixth instruction asked by defendant was ruled against in 40 Ark., 511. The eighth *is not the law. Any delusion* does not justify a homicide. If defendant was sane as to this crime, but insane upon other questions, the insanity will not excuse. Whart., Cr. Law., sec. 41.

HEMINGWAY, J. The appellant, John D. Bolling, was indicted, tried and convicted for murder in the first degree, in the killing of Capt. W. J. Parks, and prosecutes this appeal from a judgment sentencing him to death. Upon his arraignment he filed a written plea, in which he admitted the killing, but denied that he was guilty, because, as he alleged, he was insane and thereby incapable of acting with malice, premeditation or deliberation.

The killing was done on the afternoon of the 3d of November, 1888, on a platform in front of the defendant's storehouse, upon a public street in the village of Charleston, in the open view of the people in the village, and was witnessed

by a number of them. The defendant sat in his door with
his gun in his hand. The deceased approached, stepped
upon the platform in front of the door, and, when within ten
feet of the defendant, the latter rose, presented his gun and
fired, inflicting a wound from which death instantly ensued.
It appears that the defendant could not have seen the de-
ceased until about the time he stepped upon the platform,
and that nothing was said by either party before the killing.
There had never been any difficulty between the parties, and
no one knew of any ill-will on the part of the deceased
toward the defendant. Nothing unusual was noticed in the
conduct of the defendant that day, and persons who were
with him a few moments before the killing say he appeared,
talked and acted as was usual with him. After the shot
was fired he walked across the street, a distance of about
sixty feet from the body of Parks, and seemed to be work-
ing with the hammer of his gun as if to reload it. Persons
who came to the body called upon him to return and sur-
render, whereupon he went back and gave up his gun. He
then drew a pistol, declaring that he could still defend him-
self. He was ordered to give it up and surrender, which he
declared himself willing to do upon a guaranty of protec-
tion. This was offered, and he was taken in custody. He
protested against being hurried off, and asked a neighbor to
lock his store. A guard escorted him directly to a neigh-
boring store, and during the evening to Fort Smith for safe
keeping. Before he was placed in custody he several times
demanded protection as a condition of his submission, and
spoke of an apprehension that he would be murdered.

The killing was on Saturday, and there was some crowd
in the village; after the occurrence there was much excite-
ment. The defendant was calm and composed, manifesting
neither excitement nor apprehension, except as they might
be implied from his demand to be protected.

On his way to Fort Smith he was cheerful and free from
excitement, affording amusement and entertainment for the
guard that attended him. He asked where he hit the de-

ceased, and when informed laughed and said it was a good shot. He manifested no sorrow for his act, but said that his conscience was clear, and he regretted that he had not done it three or four years sooner. He seems to have answered without hesitation or reserve all questions asked him at that time as to the reason for his act. The reasons assigned were not in each instance the same, though with each he either mentioned or intimated acts done or threatened by Parks.

The following may be stated as some of the different reasons assigned to different persons. Before he was placed under arrest and when called to surrender, he said all he wanted was protection; that he had been run over for three or four years by Capt. Parks and his sons Jim and Henry packing pistols in their boot-legs to kill him, and he would stand it no longer; that they had been standing around on the streets with pistols in their bootlegs to shoot and kill him, and he had determined to have peace or the gallows; that they had meddled with his private business and domestic affairs, and he would have killed Parks three or four years sooner if it had not been for his family. A few moments after the killing another witness asked him why he did it, and he replied: "I have stood all I could—I could not stand any more."

As he was conducted from the place of killing, he passed Jim Parks, and said to him: "I hated to have to do it, but he has been warned of it time and again."

On his way to Fort Smith he told A. Hedges, a witness, that the trouble between him and Parks had been brewing for three or four years, and he was only sorry he had not killed him long ago; that he had gone to church three times to kill him, and went the night before, fully determined to do it, but that he thought best not to do it. He said to the same witness, after reaching the jail yard and while waiting for the jailer, "that Parks was trying to marry his mother against her will; that the church had combined to force her to marry Parks; that he had reasoned with Parks, and downed him on religion, and he would rise and come

again; and he downed him on the scriptures, and he would rise and come again; and at last he denied revelations, and that settled it." In the jail next morning he was asked why he killed Parks, and replied: "To keep Parks from marrying his mother." He was asked if Parks had ever asked her to marry him, and replied: "You don't understand the case—the church was forcing her to marry him against her will." At the same time he said that Parks had been carrying a pistol for some time to kill him, and that Henry Parks had passed his store a day or two before with a six-shooter in his hand to kill him, and would have killed him, but he ran or darted into the store. He was then asked if he had anything against Jim Parks, and said, "No; only Jim asked him once if he did not want to travel."

To another witness he made about the same statement as to the one last referred to, and said further that he carried his pistol to church the night before intending to kill Parks, but thought it might not be sufficient; and further that Parks objected to his going to see his daughter; and if he was not welcome to visit her, Parks was not welcome to visit his mother. When speaking of Parks' purpose to marry his mother and the church's aiding him in the matter, he said " that John Armistead, Dr. Barnes and brother Joe Burt, if he was living, could tell all about it." The parties named, except Joe Burt, were produced as witnesses, and stated that they had never heard of the matter.

J. P. Falconer, who was of the guard that conducted him to Fort Smith, asked him in the jail yard that night, why he did it, and if he was sorry? He said, "he was not sorry, except that he had not done it twelve months ago; that nobody knew what he had stood and gone through; that they had been dogging him for the last four years; that he thought the thing was settled, but no longer than yesterday it came up again; that Parks had been trying to injure him in his business affairs and in the church, and he had been in dread of his life for four years; that, no longer than the day before, Parks passed his door with a pistol in his bootleg,

S C—38

and would have killed him if he had not run in the house."
He then repeated the statement, heretofore set out, of Parks'
purpose to marry his mother, of the church's aiding him in
it, and of his arguing the matter with Parks; and in proof
of his statement referred him to the parties named to the
other witnesses. He was asked how he knew the church
had taken hold of the matter, and he answered that " they
had told it to him in their prayers."

Another witness some time afterwards asked him why he
did it, and he said, " that was for him to know; that the
thing had been going on for four years, and he could stand
it no longer."

To another witness some time after, and to his mother
before, the killing, he said that he was the only thing in the
way of Parks' forcing her to marry, and that Parks and his
sons were trying to kill him so as to get him out of the way;
he told this witness that Parks went to church and to his
place of business and made mouths at him and danced
around him; that on the day of the killing Parks came upon
the platform, and commenced making mouths at him and
dancing before him, and the " Lord said kill him, and he
obeyed."

After the defendant's arrest and while he was in the jail,
he evinced the usual concern about his business affairs, and
gave directions as to their management. He was about 35
of age, a widower, and a merchant by occupation. He was
a peaceable man, and no witness knew of his ever having
any trouble except once over a game of marbles. His
father was the victim of delusions with reference to a lady
whom he had once loved, and, although he had married
another, he often imagined that she was present, and that
he saw her. Those delusions so affected him, that he left
his house and family, and was found a physical wreck, sub-
ject to the same delusions. His grandfather is described as
a subject of insane fancies which prompted the most loath-
some and unnatural practices, and to remonstrances against

them he replied by quotations from scripture without aptness or relevancy.

About three or four years before the killing the defendant conceived the idea that the deceased was trying to force defendant's mother to marry him. He approached her on the subject, and she assured him that there was nothing in it, but he replied that she did not understand the matter as well as he did. He frequently after that time talked to her about it, and on the morning before the killing he requested that she would not take Parks' hand in a church meeting, and that night he told her that he could not stand to go to church again where he would see Parks. A lady acquaintance once spoke to his mother in his presence about the deceased, and he visited the lady next morning and told her that if it were repeated there would be bloodshed. No witness knew of any inclination on part of the deceased to marry his mother, and she testified that he had never requested it directly or indirectly, nor at any time engaged in conversation with her.

About two weeks before the killing the defendant went into a neighboring store asking to borrow a pistol, and indicating ill-feeling toward Parks. About the same time he bought a gun, saying that he wanted to be able to hit a stump or a tree, and it appears that he practiced shooting until the homicide occurred.

After the killing, a small paper writing, headed "The Reason," was found in a file of his papers, and is as follows: "The cause of my uneasiness is the old man and Jim Parks have threatened my life and for no cause, only to injure me." This was dated October 21, 1888 and was signed "J. D. Bolling." Two pages of his mercantile account book were pasted together, and, when loosed, they disclosed the following entries, to-wit: "If I am murdered, you may know that old man Parks did it or had it done, for he has contemplated it" (dated July 20, 1888, signed J. D. B.), and "The dogs determined to have my blood" (dated September 14, 1888, signed J. D. Bolling).

Two years or more before the killing he asked to accompany a daughter of the deceased to an entertainment, but she declined his escort. Remarks made by him recently before the killing indicated that he entertained an unpleasant recollection of this occurrence, and possibly ill-feeling towards the deceased on account of it. Since it occurred he had married, and his wife with an infant had died. On the occasion of their death, he was observed to act strangely, and to evince an unnatural indifference to his bereavement. He slept through the travail of his wife, and laughed in the presence of his dead child; and, to enforce the observance of certain details with reference to its burial, asserted that it was his property to be disposed of at his will. Some other circumstances were proved as tending to show a general disordered condition of his mind, but we have stated enough of the proof to give an outline of the defense, and thereby afford an understanding of the questions raised by this appeal.

Many exceptions were taken and properly saved during the trial, and we proceed to consider such of them as we have thought demanded our consideration.

1. Witnesses may be recognized in defendant's absence. 1. The venue was changed from the Franklin to the Logan circuit court; after the order had been made, the court had the witnesses called and recognized to appear as witnesses in the Logan circuit court; the defendant was not present, and it is urged that the recognizance could not be taken in his absence. We do not think that this was a substantive step in the case which could not be taken in his absence.

2. Evidence. 2. Evidence was admitted, against the defendant's objection, that he bought a gun a few weeks before the killing, practiced shooting it, and had it repaired. If these circumstances took place in preparing for the homicide, they were admissible and proper to be considered in determining the *animus* with which the act was done. They were sufficiently proximate to the act to warrant their admission; and whether they were really a part of the preparation, and if

so, what weight they should have in determining the *animus* of the defendant, were questions for the jury. Besides, as they were acts of the defendant done at a time near the homicide, they were proper to be considered in determining the condition of his mind at that time.

3. The State proved, against the objection of the defendant, that in February, 1886, the defendant wrote a note to a daughter of the deceased, asking to escort her to an entertainment, and that she replied : " His company was not accepted." It is contended that this circumstance had no tendency to elucidate the issues joined, and that its admission was error. There was other proof that, recently before as well as after the killing, the defendant spoke of the fact that he was not welcome as a visitor of Parks' daughter, with some apparent feeling. Thus connected, we are of the opinion that it was proper to admit the proof.

4. The defendant, upon his written plea admitting the killing charged but denying his guilt because he was insane and incapable of acting with malice, deliberation or premeditation, asked to open and close the case. This request was refused, and he excepted. The statute provides that there shall be but three kinds of pleas to an indictment, to-wit : guilty, not guilty and former conviction or acquittal of the offense charged. Mansf. Dig., sec. 2172. In this case the defendant pleaded not guilty, and with his plea set out the reason relied upon to sustain it. Everything except the denial of his guilt was surplusage, and the issue was the same as if he had pleaded not guilty in the ordinary manner. Having pleaded not guilty, he cast upon the State the burden of proving his guilt as laid, and this entitled it to open and close. If the defendant's contention be sound, other defendants might admit homicides charged against them and deny guilt upon the ground that they acted in self-defense or in the prevention of a felony or in any other manner. which would excuse them, and thereupon claim the same right. The defense in this case is one often made, and we have been cited to no case to sustain the defendant's posi-

3. Right to open and close,

tion. So far as we are advised, the State's right to open and conclude has been uniformly recognized, while the defendant's right has been expressly denied in cases adjudged by the Supreme Courts of Ohio and Iowa. *Loeffner* v. *State,* 10 Ohio St., 598; *State* v. *Felter,* 32 Iowa, 49.

4. When witness may give opinion as to insanity.

5. After the witness Hedges had detailed what the defendant said and did, and described his appearance and manner from the time of his arrest until he was left in Fort Smith, the defense asked him two questions which were objected to by the State and excluded by the court. The questions were as follows:

(1.) "Did you, while in company with the defendant from the time you arrested him until you turned him over to the jailer in Fort Smith, see anything in his conduct, appearance, manner or conversation that indicated to your mind that he appreciated the character of his act in killing Capt. Parks; and if you did, what was it that you saw or heard?"

(2.) "From what you saw of defendant in the street at the time you arrested him, his conversation in the street, at Falconer's store, on the road to Fort Smith, in the jail yard and in the jail, and from what you observed of his appearance, his coolness and his general manner, what is your opinion as to his being controlled by or suffering under an insane delusion in regard to Capt. Parks' marrying his mother against her will, the church assisting to bring about this marriage, and the desire on the part of Capt. Parks to put the defendant out of the way so as to obtain his mother?"

We are of the opinion that there was no error in excluding the first question. It called for an inference from what he (witness) had failed to see, and not for an opinion based upon what he had seen and detailed. Although the witness may have observed nothing which indicated that the defendant appreciated the character of his act and might have so answered, that could not have proved that defendant did not appreciate it. His failure to observe it might have arisen

from his inattention or from the studied concealment of the defendant. It is not strange that a prisoner, though guilty, should suppress the evidences of his conscious guilt, nor can his failure to manifest them be made proof of his innocence. If the response elicited had been negative, it would have established nothing; and if it had been positive, that evidences of appreciation were observed, that could not have aided the defendant.

We are of opinion that the second question called for competent evidence, and that the witness should have been permitted to answer it. The reason of its exclusion does not appear from the record. It could not have been either because the witness was asked to state his opinion, or because he was asked to state one as of a time after the killing, or because he was asked to state one based upon the manner, acts and conduct of the defendant. For the court admitted in evidence opinions of non-experts upon the question of sanity, and proof of the acts, conduct, manner and declarations of the defendant after the killing. The ruling that the question could not be answered must have been placed on the ground that it sought an opinion as to the sanity of the defendant upon a particular subject, and not generally. As a rule, the conduct as well as the language of a defendant after the commission of a crime, not forming a part of the *res gestæ*, is inadmissible in his favor; but when insanity is set up, the rule is sometimes different. They are then admissible whenever they are so connected with or correspond to evidence of disordered or weakened mental condition preceding the time of the offense, as to strengthen the inference of continuance and carry it by the time to which the inquiry relates, and thus establish its existence at that time; or whenever they are of such a character as of themselves to indicate unsoundness to such a degree or of so permanent a nature as to have required a longer period than the interval for its production or development. *Com.* v. *Pomeroy*, 117 Mass., 143. As such acts, conduct and declarations were admissible, was it competent for the

witness, after stating them, to state his opinion based upon them as to the sanity of the defendant? The affirmative was expressly ruled in *Kelly's Heirs* v. *McGuire*, 15 Ark., 601, and has been since then the settled rule of this court. If the witness could state an opinion as to sanity in the abstract, we see no reason why his attention should not be directed to the particular subject to which the acts and conduct testified to by him relate, and his opinion as to the sanity of the defendant as regards it elicited. We think it might be done, for if an opinion assists in reaching a correct conclusion, one with reference to the monomania to which the evidence points would furnish more assistance than one that was general.

5. When irresistible impulse no defense.

6. The defendant presented thirteen instructions, and asked that they be severally given to the jury; the court refused to give any of them, and it is now insisted that each of them should have been given. In a number of them a rule was announced that although the defendant knew what he was doing and that it was wrong, still if he did not have power of will to abstain from the act, he would not be responsible. As we view the evidence, there was nothing upon which to base an instruction as to the law governing the defendant's responsibility if acting under the control of an irresistible impulse; and for this reason no instruction should have been given relating thereto. Moreover, the instructions asked made no distinction between insanity and mere passion or revenge, but declared that an irresistible impulse, from whatever source arising, would absolve the defendant from responsibility for acts done under its sway. Such is not the law; but when an act is done under the influence of anger or resentment, it matters not how violent they may have become nor that they may have acquired absolute dominion over the actor, he is responsible to the law if his act be otherwise criminal; and for this reason, as well as the other, the instructions into which that rule entered were properly refused.

7. In several of the instructions the rule was announced that if the defendant was possessed of a delusion that Parks was trying to marry his mother and the killing was caused by this delusion, he would not be responsible. The rule, as stated in McNaghten's case (10 Cl. & F., 200) and generally approved, is that, if the defendant labors under a partial delusion only, and is in other respects sane, he must be considered in the same situation as to responsibility as if the fact with respect to which the delusion exists were real. So if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment; but if his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment. If Parks had been in fact trying to marry the defendant's mother against her inclination, it would not have warranted the defendant in taking his life; and, applying the rule above stated, such a delusion would not excuse him.

8. The thirteenth instruction asked by the defendant was a correct declaration of the law upon this subject; but while it told the jury that a delusion would only absolve from guilt when the facts if real would excuse it, it failed to tell the jury what facts would excuse a homicide, and left that matter to be determined by the jury without aid or guidance from the court. In that respect it was incomplete, and improperly cast upon the jury the determination of a matter of law. The omission should have been supplied and the instruction given, as it presented the law applicable to the defendant's theory of the case. We do not mean to say that the failure to supply the omission and give the instruction was a reversible error on part of the court, but that to have done so would have been proper, since it presented the law applicable to a theory of the case which the jury were bound to consider in reaching a verdict and which had not been treated in the instructions given.

*6. Rule as to insane delusion.*

7. Burden of
proof as to in-
sanity.

9. It was decided in *Casat* v. *State*, 40 Ark., 523, that the burden was upon the defendant to prove insanity by a preponderance of the evidence. We adhere to that ruling, and approve the court's refusal to charge, as asked by the defendant, that the burden was upon the State to prove his sanity.

10. Other instructions refused were either abstract or argumentative, and there was no error in their refusal.

11. The court gave but two instructions which related to the law of insanity, and they treated it entirely in the abstract. The first declares that it is incumbent on the defendant to prove by a fair preponderance of the evidence that, at the time of the killing, he was laboring under such a defect of reason arising from a disease of the mind as not to know the nature and quality of the act he was committing; or if he did know it, that he did not know he was doing wrong. This embodies the rule as stated in McNaghten's case and in Casat's case, and meets our entire approval.

12. The last instruction bearing upon that subject contains two clauses; in the first it seems to announce the rule as above stated, but in the second a different one. It there says: "Insanity will only excuse the commission of a criminal act, when it is made to appear affirmatively, by evidence fairly preponderating, that the person committing it was at the time insane to such an extent as not to know right from wrong." By this test, if the defendant knew or could distinguish right from wrong in the general affairs of life, he would be guilty, although, upon the one matter pertinent to his case, his knowledge and power of distinguishing right from wrong were wholly deficient. It can make no difference that the other instruction correctly states the rule; for the two are contradictory and irreconcilable, and we have no means of determining which the jury accepted as its guide. It may be that the defendant knew it was wrong to steal, rob, lie or murder; still, if his mind was diseased, and by reason thereof he had a fixed belief that the deceased had injured or was attempting to

injure him, and that it was his duty to kill him, or that it would be no wrong against the laws of God and nature to do it, he would be absolved from guilt; but although the jury may have found the facts as stated, it could not have acquitted the defendant if it observed the rule stated. That the jury accepted it as the test by which to determine this cause, seems probable when we have considered the court's ruling upon the admission of evidence; for while it permitted witnesses to state their opinions as to whether the defendant was sane or insane generally, it excluded all opinions as to the condition of his mind upon the subject of his relations with Parks. That ruling, in connection with the charge given, may have led the jury to believe that if the defendant was sane generally, he could be held responsible, although he was absolutely insane upon that subject. In this we think there was prejudicial error.

Without going further into the instructions given or refused, we will announce the principles which we think should govern in the trial of this case; and by them the correctness of the charge may be tested. If the defendant labored under a delusion as to the acts and purposes of Parks, and by reason thereof really believed that it was not wrong under the laws of God and nature to kill him, he would not be responsible; but although he had a delusion, still if his reason was not dethroned and he knew that it was wrong to kill Parks, he would be responsible, unless the delusion was that Parks was in the act of attempting to kill him, and that it was necessary for him to kill Parks to prevent his own death or serious bodily harm. The delusion that Parks was attempting to marry his mother, or had tried to injure him in the church or in his business, would not excuse the killing; for such facts, if real, would furnish no excuse; to acquit the defendant on account of such delusion, there must also appear an absence of the knowledge of right and wrong in relation to the facts assumed.

For the errors indicated, the judgment will be reversed, and the cause remanded.