BINYON vs UNITED STATES.

Opinion delivered September 23, 1903.

1. *Murder—Defense of Insanity—Insufficient Evidence to Sustain.*

In a prosecution for murder, under plea of insanity, evidence of the delirious ravings of a sick man occurring years before the killing and no proof of insanity in the blood of his family nor of any act indicating insanity except the killing and conduct in relation thereto, *Held,* wholly insufficient upon which to found a reasonable doubt as to defendants mental responsibility.

2. *Indictment—Motion to Quash—Found Only in Bill of Exceptions Not Properly in the Record.*

Where a motion to quash an indictment does not appear in the record, proper, but, with the evidence to support it is made a part of the bill of exceptions, it is not properly in the record and errors in ruling thereon will not be considered.

3. *Indictment—Motion to Quash—Exclusion of Negroes from Grand Jury.*

A negro indicted by the grand jury from which other negroes have been excluded because of their race or color may have such indict-

ment quashed; but the mere absence of negroes from the juries for some years, without proof of the prejudice of the judge who selected the jury commissioners, or of the commissioners does not afford sufficient ground to quash the indictment.

4. *Criminal Procedure—Challenges of Jurors.*

Before any advantage can be taken of error in overruling challenges of jurors for cause, it must appear that the party's peremptory challenges were exhausted; and any such error is cured by challenging for cause without first exhausting the peremptory challenges.

5. *Indictment—Names of Witnesses—Criminal Procedure—Governed by Arkansas Law in Indian Territory.*

The service of copy of indictment with names of witnesses thereon is a matter of procedure and provided for in Sec. 1033 Rev. Stat. U. S. But by Act of Cong. Mar. 1, 1895 the criminal procedure of Arkansas contained in Chapt. 46 Mansf. Dig. is put in force over Indian Territory and, being a special statute and later, governs. And under that law a defendant is not entitled to a list of the witnesses who will testify at the trial.

6. *Murder—Trial—Remarks of Counsel.*

In a prosecution for murder, where it appeared from the evidence that the private parts of the deceased female were swollen and torn, when found dead, it was not improper for the government's attorney in his argument to the jury to suggest that rape might have been the motive for the killing.

7. *Murder—Trial—Instructions as to Insanity—Required Only When Evidence Requires.*

In a prosecution for murder the defense pleading insanity, it is not error for the court to refuse to give an instruction concerning insane delusions, where there is no evidence of an insane delusion of any kind.

8. *Criminal Law—Insanity—Instructions.*

In a prosecution for murder, insanity being the defense it is not error to refuse an instruction that where the insanity is of a permanent type, such a condition, proved to have once existed, is presumed to have continued until the time of the commission of the criminal act where the proof failed to show any permanent condition of insanity at any time before the killing.

9. *Trial—Cross-Examination—Harmless Error.*

A defendant in a trial for murder, is not harmed by the manner of cross-examination of his witnesses when such examination went no further than to obtain from each witness a statement that ·he did not know the defendant's handwriting.

10. *Trial—Objections to Testimony—Must be Specifically Shown in Record.*

Errors based upon the courts' rulings on defendant's objections to questions asked his witnesses will not be considered where the particular question or questions are not specifically pointed out, as being too general an assignment of error.

11. *Errors—Not Made Part of Record by Including in Specifications.*

Where matters complained of as errors are merely assigned in the specifications of errors, and not otherwise made a part of the record, same will not be considered; although the assignment is improperly made a part of the bill of exceptions.

Appeal from the United States Court for the Southern District.

HOSEA TOWNSEND, Judge.

Rufus Binyon, convicted of murder. Appeals. Affirmed.

On December 20, 1900, an indictment, was returned against the appellant, charging him with the murder of one Mary Hawthorn, a child eight years of age. There was a motion filed to quash the indictment, which was overruled, but the motion itself, the ground upon which it was predicated, and the proof offered in its support nowhere appear in the record, except in the motion for a new trial. The case was tried to a jury, and on January 15, 1902, a verdict was returned into court finding the defendant guilty as charged in the indictment. The defendant was duly arraigned, and had entered his pleas of insanity and not guilty, which issues were tried together before one jury. Exception was taken to the action of the court in

overruling the motion to quash the indictment, and during the trial numerous exceptions were taken to the admissibility of testimony, the competency of witnesses, and the charge of the court.

*S. T. Wiggins,* for appellant.  *W. B. Johnson* and *J. E. Humphrey,* for the United States.·

CLAYTON, J.  The facts, as developed by the proof, were that the defendant is a negro, and lived within the jurisdiction of the court trying the case, and in which district the killing was also done.  He was a married man, and he, his wife, and the deceased were living together.  The deceased was a colored child about eight years old, and an orphan, living under the care and protection of the defendant.  Late in the afternoon of the day of the killing the defendant's wife went to a neighbor's house for some sorghum plants.  She remained a short time, and returned to her home, but soon afterward came running back, crying out that the child had fallen into the fire and was burned. The neighbors at once went to the house and found the child lying in the fire, dead.  It was horribly burned.  Its clothing was entirely destroyed by the fire.  When they would lay their hands upon it, as stated by the witnesses, "the skin would slip off."  Wounds were found upon the body, noticeably one upon the head.  The next day a doctor was called in.  He examined the body, and testified that the wound on the head was about three inches long, cut to the skull, and in the center the skull was broken and crushed in; and that there were marks of con- siderable violence all over her body and on her face, besides being badly burned; and that the wound on the head was a fatal one.  It was this wound, doubtlessly, that caused her death. Two witnesses testified that her private parts were swollen, lacerated and torn.  About noon of the day of the killing the defendant had been at this doctor's house to procure some lini- ment for bruises, and, among other things, said to the doctor

that he had given the child a violent whipping. Shortly after the neighbors had collected at the house, the defendant was seen about three-quarters of a mile away. He said he had been at one of the neighbors to get some potato plants. The defendant confessed his crime to a number of persons. To one he said: "Well, he told me that he whipped this child twice the day he killed it, and the last time he whipped it he said he put it in the bed. It was sick some way or another, and he put it in the bed, and he went to the field. He was hoeing corn, and when he and his wife come back to dinner he claimed they found the child dead in the bed. And then he said to me that he said to his wife that they was into it, and they had to get out of it some way. Then I asked him what way then they thought they could get out of it, and he said then he said that he would burn it, and make it appear that it had fell in the fire and burned up, and went on and told me that he put it in the fire, and told his wife to hand him some clothes, and he set it afire; and then he was to leave, and send her down to this Willis Howe's house, four or five hundred yards away, to get some cane plants, he said; and she went down there and got them, and he was to be gone when she come back; and she went and got them, and come back, and then run back and made the alarm as though this child had fell in the fire. And when the alarm was made there was another man about one hundred and fifty yards from the house, and he looks up. He heard the hollering, and he thought it was at the house where he stayed, that was about two hundred yards; and he saw Rufus Binyon then going away from the house. He hadn't got over two hundred yards from the house when the alarm was made." To another witness he stated: "He said after she had been whipped, why unmercifully that way, why he saw she was going to die, and they laid her on a bed, and he comes up to Doctor Bernard, I suppose—well, it was up there at Ran—to get some liniment to rub over the wound, and he come back to apply the liniment, and it seems she was in a dying

condition. He just remarks that he see we were into it, that somebody would come and discover those bruises on her body and he just remarks to me that when a man gets into anything' he will try all ways he knows how to get out of it, and he thought maybe by burning it over would conceal the wounds inflicted on her body, and that was the reason why he burned it. He said just before burning it it had life in it, and he didn't have the heart to burn a child with life into it; but he didn't say anything further as to what caused her immediate death. He said something had to be done, but he didn't have the heart to burn her with life, but he acknowledged to me that he burned her." And as to the killing he made substantially the same statement to others. There was absolutely no proof in rebuttal of this testimony, except that which was offered on the issue of insanity. The defendant testified in his own behalf. He did not deny the killing, but claimed an entire forgetfulness or unconsciousness of the whole matter.

On the plea of insanity the defendant offered proof to show that some few years before the date of the killing he had fallen in love with his present wife. The father of the girl forbade the marriage. He became morose, and was taken with a spell of sickness, for about two weeks of which time he was delirious, and had to be watched, and at times held in bed. Dr. J. E. Reed, a witness for the defendant, testified that he was called to visit the defendant at that time and found nothing abnormal; except his circulation was not good; temperature normal, and, in his opinion, the defendant was shamming. The defendant married just afterward, and has never been known to have any other such spells since. He also offered testimony to the effect that when he was a boy, going to school, in Alabama, he was sometimes "curious"; he would not study as well and learn as fast at some times as at others. When he would miss answering a question, and the teacher would scold him, "he would look

flustrated and curious." He would sometimes catch boys, and hold them, and afterwards, when spoken·to about it, he would say, "I didn't mean to hurt you." He would sometimes strike his head and say there was something crawling in there. He acquired some education and taught school some. As another evidence of insanity, it was proven that he applied for license, which was refused him by the presbytery, because they thought him an improper person to preach. He showed some ill temper because of this, but still he was permitted to preach on some occasions. One witness, as an evidence of his insanity, testified that he would "preach curious." He would say, "That's the candy," or "That's the stuff." Another witness thought him "curious" because he "did not preach like other preachers. He ·would preach his own experiences instead of the Bible." And all of the testimony offered to prove his insanity was of this trifling and unconvincing character. The theory of insanity was largely founded upon the delirious ravings of a sick man, (if, indeed, he were not shamming), occurring years before the killing. There was no evidence to show that the taint of insanity was in the blood of the family, or that the defendant did any act ndicating insanity, except to kill the child and burn her to hide the evidences of his guilt, shortly before, at the time, or after the killing. At noon of the day of the killing, and probably immediately after the fatal blow had been stricken, he was seen by Dr. Bernard, to whom he went to get liniment. The doctor testified that he had known him for three years; that during that time he had practiced in his family, and had never seen any evidence of insanity, and that he seemed to be perfectly sane, as much so as he had ever seen him, on the day of the killing; that he was as intelligent as ordinary colored men. Those who talked to him immediately after the killing pronounced him sane. Neither his conduct nor his language indicated any symptoms of insanity. The truth of the whole matter is that the proof of insanity was wholly insufficient upon which to found a

reasonable doubt as to his being mentally responsible for the act.

The first assignment of error is: "First. That the court erred in overruling the motion of the defendant to quash and set aside the indictment returned by the grand jury against him, which is a part of the record in the motion for a new trial in this cause; to which ruling of the court the defendant, by his counsel, then and there excepted, and still excepts." The record shows that motion to quash the indictment was filed and overruled, but the motion itself and the evidence to support it nowhere appear except in the motion for a new trial. The defendant's counsel undertake to make record by setting up the motion and the testimony in support of it in the motion for a new trial, and putting that in his bill of exceptions. How can the court know if the motion and the testimony is correctly stated? It may be that the very reason the motion for a new trial was overruled was that these matters were not correctly stated by cousel in it. Of course, we make no such imputation, but the fact that, if allowed, a false record could be made in this way, is the strongest reason why the record cannot be made in this way. A motion for new trial is drafted by counsel. They may put in it whatever they please. The court's control over it is only to sustain or overrule it, and it goes into the bill of exceptions as it was written. Its object is to call the court's attention to, and get another ruling on, questions which counsel may deem have been erroneously determined by the court, and not to make record. The judge's certificate to this bill of exceptions certifies that the motion for new trial, as set out, was filed, and not that its statements are true. If this were an ordinary case, we would not notice this exception, because the record on which it is founded is not properly before us. But, the case being such a grave one, we will consider it.

The motion to quash the indictment is a lengthy one, and we will not set it out in full. It moves the court to quash the

indictment on the grounds that: "(1) That the jury commis-
sioners appointed to select the grand jury which presented said
indictment selected no persons of color or African descent,
known 'as 'negroes,' to serve on said grand jury, but, on the
contrary, excluded from the list of grand jurors all persons
known as 'negroes,' because of their race, color, and previous
condition of servitude. (2) That the said grand jury was com-
posed exclusively of white people, although the population of
the Chickasaw Nation in and about Ardmore, and within the
jurisdiction of the United States, and all within the Southern
District of said Court, within the Indian Territory, sitting at
Ardmore, in the district and territory aforesaid, consisted of
about twelve thousand negroes, many of whom were fully
competent and qualified to serve as grand jurors." "(4) That
the United States district judge a white person, selected no one
for jury commissioners except white persons, notwithstanding
many of the negroes in said jurisdiction were competent and
qualified to serve as such. (5) That Rufus Binyon, the de-
fendant above named, and herein charged, is a negro, and is
charged with having committed the crime of murder."

The proof on the motion showed that for about three years
there had been no negroes on the juries of the court at Ardmore;
that there was a large number of that race living in that district
many of whom were fully qualified and competent to serve as
grand and petit jurors. There was some proof that there existed
in that district some race prejudice. But no proof was offered
that the judge who selected the jury commissioners, or the
commissioner themselves, entertained any such prejudices, and
we presume it could not be proven. It was not shown that any
member of the grand jury which found the indictment enter-
tained any race prejudice. The witnesses were colored men,
and some of them were of the opinion that in certain cases
negroes could not get as fair a trial before white juries as they

could if the jury was composed of colored men; but where the defendant was a colored man, and the party against whom the offense was alleged to have been committed was also colored, they thought in such case the defendant could get as fair a trial as if the jury were of their own race.    It is unquestionably true that citizens of the African race have a constitutional right to sit upon our grand and petit juries, and that any abridgement of that right because of their race or color is unlawful.   And it is also true that, if colored men are excluded from the grand jury because of their race or color, every negro indicted by such grand jury may, by proper motion and proof made before entering upon trial, have the indictment quashed as to him.   Neal vs Delaware, 103 U. S. 370, 26 L. Ed. 567; Virginia vs Rives, 100 U. S. 313, 25 L. Ed. 667; Bush vs Kentucky, 107 U. S. 110, 1 Sup. Ct. 625, 27 L. Ed. 354.   The defendant in this case is of the African race, and was indicted by a grand jury composed entirely of white men, and therefore, if he has shown by proof in support of his motion to quash the indictment that negroes were excluded from that grand jury because of their race or color, he was entitled to have his motion sustained, and, if such were the case, it was reversible error of the court to overrule it and force him to trial on that indictment.

The whole question, then, is, does the proof show that the absence of negroes on the grand jury that found the indictment in this case was because of their race or color?   The entire exclusion of negroes from jury service for a long period of time in a district largely inhabited by them, where some of them were qualified for such service, would, at least, be a circumstance tending to show they were excluded because of their race.   In this case the grand jury which found the indictment was organized on the 17th day of December, 1900.   The indictment was returned on the 20th day of December, 1900.   Under the law that prevails in this jurisdiction, jury commissioners to select

grand and petit jurors are appointed, and make out and file their selection at the preceeding term.   Mansf. Dig. § 3982 (Ind. Ter. St. 1899, § 2662.)   When the jury commissioners that selected the grand jury which returned the indictment in this case were appointed does not appear from the record before us, but under the law it must have been at the spring term, 1900, and therefore, as the jury commissioners and the grand jury were both selected at that time, it was then that the wrong, if any, was done.   The proof on the motion to quash was taken January 13, 1902, or about one year and six months after the selection of the grand jury.   At that time—January 13, 1902 —the witnesses state that there had been no colored man on the grand jury for about four years, and none on the petit jury for three years; that is, at the time the jury commissioners and the grand jury were selected, about one year and a half before the evidence was taken, there had not been a colored grand juror for two years and a half, nor a colored petit juror for one year and a half.   Is the fact that at the time of the selection of the grand jury that found this indictment there had not been a colored man selected as a member of that body for two years and a half, or of the petit jury for eighteen months, and, if it be deemed material, that for eighteen months thereafter none such were chosen, sufficient to sustain the proposition that the particular grand jury that found this indictment excluded colored men because of their race or color?   In the case of Virginia vs Rives, supra, the Supreme Court of the United States say: "The assertion in the petition for removal that the grand jury by which the petitioners were indicted, as well as the jury summoned to try them, were composed wholly of the white race, and that their race had never been allowed to serve as jurors in the county of Patrick in any case in which a colored man was interested, falls short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their color or race.   The facts may have been as

stated, and yet the jury which indicted them and the panel summoned to try them may have been impartially selected." Nor does the case of Neal vs Delaware, supra, contravene this declaration of the law. In that case it was agreed that the petition, which charged directly that the reason that colored men were excluded from the juries was because of their race and color, should be taken as evidence in the case, and counsel in argument before the court treated it as if the proof had been made made. Following, then, as we must do, the law as laid down in Virginia vs Rives, we conclude that, before an indictment can be quashed on the ground that colored men were excluded from the grand jury that found it because of their race or color, other proof than the mere fact that for some considerable period of time no colored jurors had served on the juries of the court must be offered. In Virginia vs Rives no colored man had ever been allowed to serve as a juror in Patrick county, the county in which the court was held. In this case, but two years before the jury was selected that found the indictment colored grand jurors were allowed to sit with the grand jurors, and eighteen months before colored men were allowed on the petit juries. There was no evidence otherwise to show that the judge who selected the jury commissioners, or that any member of the commission or of the grand jury, had any prejudice against colored men. We therefore hold that the court below did not err in overruling the motion to quash.

The second and third specifications of error are that the court erred in overruling the defendant's challenges for cause to H. B. Moore and J. H. Upchurch as petit jurors, and forcing him to exhaust two of his peremptory challenges upon them. It nowhere appears in the record, except in the motion for a new trial, that these two jurors were challenged at all, or that the court made any ruling on the question; and, as the court has before held in this case, the motion for a new trial cannot

be used to bring matters occurring at the trial upon the record in this way. But, if it were properly before us, the answer to this contention is that it nowhere appears that the defendant exhausted his challenges in the case; and, before he can take any advantage of any error in this particular, this must always appear. Benton vs State, 30 Ark. 328; Wright vs State, 35 Ark. 639; Polk vs State, 45 Ark. 165; Hughes, Crim. Law & Pr. 2539; Wharton, Crim. Pl. & Pr. 693; McGowan vs State, 9 Yerg. 184; Burrell vs State, 18 Tex. 713; Murphy vs State (Tex. Cr. App.) 51 S. W. 940; Spies vs Illinois, 123 U. S. 131, 8 Sup. Ct. 21, 31 L. Ed. 80. And therefore, whatever the ruling of the court may have been, it was cured by the defendant having challenged the two jurors without having exhausted his peremptory challenges.

The fourth specification of error is, in effect, that the court erred in overruling defendant's objection to the admission of the testimony of certain witnessess, because their names had not been indorsed upon the indictment. It appears that certain witnesses were permitted to testify whose names had not been originally indorsed upon the indictment. These were witnesses who had not been before the grand jury that found the indictment. It appears, however, that at a term after finding the indictment and after a copy of the original, with its indorsements, had been properly served on the defendant, the United States attorney, by leave of the court, indorsed on the original indictment the names of the witnesses objected to at the trial. Defendant's counsel insists that under section 1033, Rev. St. U. S. (U. S. Comp. St. 1901, p. 722), he was entitled to have served upon him, two entire days before the trial, a list of all the witnesses to be produced by the government to prove the indictment. And, if this procedure is to be had under the provisions of the Revised Statutes, he is clearly correct. It is clear that the serving of a copy of the indictment and a list of

witnesses upon the defendant relates entirely to the procedure, and by the act of Congress entitled "An act to amend an act entitled 'An act to establish a United States court in the Indian Territory and for other purposes,'" etc., approved March 1, 1895, c. 145 (28 Stat. 693), the whole of the criminal procedure of the laws of Arkansas contained in chapter 46 of Mansfield's Digest of the laws of that state is extended over and put in force in the Indian Territory. And this being a special statute relating alone to the Indian Territory, providing an entire system of criminal procedure for it, and also being a later statute than the provisions for such procedure in the Revised Statutes of the United States, it is clear that the criminal procedure in Mansfield's Digest must prevail. And, as far as this question is concerned, that procedure is as follows, "Sec. 2103. When an indictment is found, the names of all witnessees who were examined must be written at the foot of the indictment." Ind. Ter. St. 1899, § 1446. And it is evident that this means the names of the witnesses who were examined before the grand jury. And it has been held that the omission to indorse on an indictment the names of the witnesses so examined is not ground for demurrer (State vs Brandon, 28 Ark. 410). nor cause for setting aside the indictment (State vs Johnson, 13 Ark. 174). "Sec. 2152. That it shall be the duty of the clerk of the court in which an indictment against any person for a capital offense may be pending, whenever the defendant shall be in custody, to make out a copy of such indictment and cause the same to be delivered to the defendant or his counsel at least forty-eight hours before he shall be arraigned on such indictment; but the defendant may, at his request, be arraigned and tried at any time after the service of said copy." Ind. Ter. St. 1899, § 1495. Of course, the copy must contain the names of the witnesses indorsed on the original, and all other indorsements. These are all of the requirements of the statute relating to service of a copy of the indictment and a list of witnesses on the defendant.

In this case everything in this connection which the law requires to be done was done. A list of the witnesses examined before the grand jury had been indorsed on the indictment, and a copy of it, with the list so indorsed, had been duly served upon defendant, at the proper time; and therefore the court below did not err in holding that the defendant was not entitled, as a matter of law, to a list of all the witnesses to be produced at the trial who had not been examined before the grand jury.

The fifth, sixth, seventh, eleventh, and twelfth specifications go to the competency and relevancy of certain testimony, which was admitted over the objection of the defendant. We think it sufficient to say, without setting out the evidence, that we have carefully examined the record, and find that none of the evidence objected to was improperly admitted.

The eighth specification of error is to the effect that counsel for the government, in argument, in discussing the proof of the swollen and torn private parts of the deceased, suggested that rape may have been the motive for the crime. The only mention of this part of the case is in the motion for a new trial, the specification of errors (which is erroneously included in the bill of except ons), and in two affidavits appended to the bill of exceptions below the judge's signature, and not certified to by him, none of which is any part of the record properly brought before us. It would seem, however, that when it is considered that the child's private parts were proven to have been swollen and torn when she was found dead—which was clearly competent—it was not improper for the United States attorney, in alluding to it, to suggest that rape might have been the motive of the killing.

The ninth and tenth specifications allege error in refusing the following instructions asked for by the defendant: "That the conduct may be in many respects regular, the mind acute, and the conduct apparently governed by rules of propriety, and at

the same time there may be insane delusions, by which the mind is perverted." "That where the insanity is of a permanent type or continuing nature, or possesses all the characteristics of a confirmed disorder, such a condition, proved to have once existed, is presumed to have continued until the time of the commission of the criminal act." As to the first of these instructions asked for: "The existence of an insane delusion in a criminal case is a defense only when the imaginary state of facts, if real, would justify or excuse the crime." Bolling vs State, 54 Ark. 588, 16 S. W. 658; Wharton & Stille's Medical Jurisprudence, 126; Buswell on Insanity, 429. In this case there was absolutely no evidence of an insane delusion of any kind, and therefore it was not error to refuse this instruction. As to the second, the rule only applies as to "general or habitual insanity," as in cases of chronic or permanent standing. "If the malady is occasional or intermittent in its nature, the presumption does not arise, and he who relies on insanity proved at another time must prove its existence also at the time alleged." "When insanity appears as the result of some special or temporary cause, and experience shows that, the cause being removed, the effect will probably disappear, the presumption does not prevail. Thus it does not apply to temporary insanity caused by a violent disease, and in such case the party alleging it in avoidance of an act must bring his proof of continued insanity to that point of time which bears directly upon the subject in controversy, and not content himself merely with proof of insanity at one certain period." Buswell on Insanity, 190; 16 A. & E. Enc. of Law (2d Ed.) 606, and authorities cited. As before stated, in this case the proof of insanity rested almost, if not entirely, upon the fact that some three or four years before the homicide the defendant, having failed to get the consent of his present wife's father to marry her, became morose and despondent, culminating in a spell of sickness, in which, for about two weeks, he was delirious. He recovered, and, after having obtained

(43)

the consent of his wife's father, married the girl, and from that time to the day of the trial nothing was shown that indicated that the condition of his mind during his sickness was permanent or prolonged, or anything other than the usual condition found in patients sick of a fever. All the other proof did not more than show the defendant to be a man with the ordinary idiosyncrasies incident to men in his condition of life. And therefore, the proof failing to show any permanent condition of insanity at any time before the killing, the instruction asked for was not the law of the case, and should not have been given, and the court below did not err in refusing it.

The thirteenth specification assigns error because of the manner of the cross-examination by the United States attorney of the defendant's witnesses Brooks, Howell, and Ransom, relating to the handwriting of defendant to a certain letter. An examination of the record shows that these witnesses were each asked if they knew the handwriting of the defendant. The object of the testimony was to prove by the handwriting of defendant that he was the author of a certain letter which the government's attorneys had in their possession and considered incriminating. But each of the witnesses answered that he did not know defendant's handwriting, and the examination of these witnesses on that matter was pursued no further. How the defendant could be prejudiced on these questions and answers we fail to comprehend.

The fourteenth specification of error is as follows: "That the court erred in overruling the objection made by the defendant to the questions asked the defendant by government's counsel, as shown by the record, in the testimony of the defendant on cross-examination." This specification nowhere sets out the particular question objected to that the defendant desires the judgment of the court upon. Nor is it shown in his brief. If it means all of the questions objected to, it is too general. If it means any particular one, it should have specified. In our

examination of the testimony of the defendant, we fail to find any objection by defendant's counsel to questions asked by government's counsel which the court improperly overruled.

The fifteenth specification is as follows: "That the court erred in this statement, in answer to the government's counsel, to wit, 'I don't know why he (meaning defendant's counsel) asks questions in that way, unless it be he doesn't know any better.' To which defendant's counsel begged pardon and excepted. 'Court: Take your exception and go on or you will get something worse.' To which statements as indicated in motion for new trial, and hostile bearing of the court throughout the trial of this cause, defendant, by his counsel, then and there excepted, and still excepts." We have gone to the motion for a new trial, as directed by this specification, but do not find either there or elsewhere in the record any mention of the incident related in the specification. Nor do we find any evidence of any "hostile bearing" of the court toward counsel for the defendant or his cause. This matter, being merely assigned as error in the specifications, is no part of the record. It is true in this case that the specifications of error are made part of the bill of exceptions, instead of being filed with the brief, as required by rule 10 of this court, 4 Ind. Ter. Rep. (64 S. W. vi), but because they are improperly placed in the bill of exceptions makes them no part of the record. There is nothing before us for our consideration in relation to this specification.

We have carefully examined the remaining specifications of error, and find no merit in them. They are that the charge of the court was prolix, that the court erred in not allowing the defendant to produce newly discovered evidence, that the verdict was contrary to the evidence, and that the verdict was contrary to the law.

Finding no error in the proceedings of the court below, the judgment is affirmed.

GILL, C. J., and RAYMOND, J., concur.