(March 24, 1910.)

## STATE, Respondent, v. THOMAS MARREN, Appellant.

[107 Pac. 993.]

SUFFICIENCY OF EVIDENCE—REFRESHING RECOLLECTION—EVIDENCE OF PREPARATION TO COMMIT CRIME—FABRICATED OR FALSE EVIDENCE— INSTRUCTIONS—ARGUMENTATIVE—REVERSAL OF JUDGMENT—QUALI- FICATION OF JUROR—NEW TRIAL—SHOWING TO BE MADE.

1. Evidence in this case examined and held to support the verdict of murder of the second degree.

2. Under the provisions of Rev. Codes, sec. 6078, a witness may refresh his recollection by reading evidence given by him upon a former trial, and then testify, if he has an independent recollection of the transaction, to the truth of the transaction or to any fact upon which such reference may refresh his recollection and enable him to speak the truth. (Ailshie, J., dissents.)

3. Evidence which tends to show preparation and plan for the commission of the crime charged is admissible as tending to show intent and purpose to commit the act, and the *animus* of the person and its weight and credit are entirely for the jury.

4. Evidence which tends to show that the accused has attempted to fabricate or procure false evidence is admissible as tending to show a consciousness of guilt; and it is not necessary, in order to render such evidence admissible, that the falsity or fabrication be proven by direct evidence. Such falsity or fabrication may be determined from the circumstances and proven as any other fact, by circumstantial evidence.

5. An instruction which argues to the jury the weight or relative value of circumstantial evidence as compared with direct evidence is not the statement of a legal proposition, and should not be given to the jury as a charge or part of a charge of the law governing any particular case; and when the court comments

upon or argues the relative weight of circumstantial evidence as compared with positive evidence, the instruction is an argument and also invades the province of the jury and is erroneous.

6. The following language contained in an instruction discussing circumstantial evidence, "although the fact may be in a degree surrounded by a doubt," could only have a tendency to confuse the meaning of "reasonable doubt" as given to the jury, and in no way aids the jury in reaching a verdict, and may create a doubt in the minds of the jurors as to the weight of circumstantial evidence and the doubt which would justify an acquittal, and should not be incorporated in an instruction.

7. The court, in instructing the jury, should state propositions of law concisely and intelligibly so that the jury may understand, without indulging in any fine-spun theories as to what the law is, applicable to the facts of the particular case, and not give the jury instructions which tend to mystify and not to aid them in reaching a verdict.

8. All instructions given to the jury should be instructions by the court, and the court should in no way indicate to the jury whether the instructions given are instructions given upon the court's own motion or at the request of either the plaintiff or the defendant, as, under the statute, it is the duty of the court to charge the jury, not particularly because requested by either plaintiff or defendant, but because the charge embraces the law applicable to the particular facts of the case.

9: Rev. Codes, sec. 8070, admonishes this court, "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." And Rev. Codes, sec. 8236, provides: "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice in respect to a substantial right."

10. Under these statutory provisions, a new trial ought never to be granted, notwithstanding some mistake or misdirection by the judge, *provided,* this court is satisfied that justice has been done and that upon the evidence no other verdict could properly have been found.

11. Even though an instruction is erroneous and ordinarily the error would be material, yet if the circumstantial evidence of the defendant's guilt is satisfactory, that is, such as ordinarily produces moral certainty, or conviction in an unprejudiced mind, and the result could not have been different had the instruction

Argument for Appellant.

been omitted, the case will not be reversed because of such erroneous instruction.

12. To entitle a person convicted of an offense to a new trial on the ground of disqualification of a juror, not disclosed upon *voir dire* and discovered after verdict, the showing should be clear and conclusive, and the trial court should be clearly satisfied that the defendant had been denied the impartial trial guaranteed to him by the constitution.

13. Where the qualification of a juror is attacked after verdict, upon the ground that the juror was biased and prejudiced and made false answer with reference thereto upon his *voir dire*, affidavits may be received in evidence upon such hearing, made by persons who testify as to the good reputation for truth and veracity of the juror, and affidavits may be considered made by other jurors who testify that the juror attacked acted fairly and impartially and without prejudice in his consideration of the case.

(Syllabus by the court.)

APPEAL from the District Court of the Fourth Judicial District, for Blaine County. Hon. Edward A. Walters, Judge.

Defendant was convicted of murder of the second degree and appeals from the judgment and order overruling a motion for a new trial. *Affirmed.*

Stockslager & Bowen, and K. I. Perky, for Appellant.

The memory of a witness cannot, under our statute, be refreshed by stenographer's transcript of the evidence; it was an attempt to get before the jury the substance of the witness Thurber's testimony taken at the former trial, the purpose of which was to bolster up his testimony. Thurber did not make the stenographer's notes; they were not made under his direction, but under the direction of the court; they were not made when the fact occurred, but seven months thereafter; they were not made at the time the fact was fresh in his memory; he did not know the fact to be correctly stated in the writing. (*Morris v. Lachman,* 68 Cal. 109, 8 Pac. 799; *Putnam v. United States,* 162 U. S. 687, 16

Sup. Ct. 923, 40 L. ed. 1118; *Brown v. State,* 28 Ga. 211; *Commonwealth v. Phelps,* 11 Gray (77 Mass.), 73; *Bashford v. People,* 24 Mich. 244; *Velott v. Lewis,* 102 Pa. 326.)

In this case, if it is sought to establish Marren's guilty conscience as an inference from his false statements, the fact that his statements were false must not be left to conjecture, must not be inferred, must not be uncertain. (*Manning v. Insurance Co.,* 100 U. S. 693, 25 L. ed. 761; *United States v. Ross,* 92 U. S. 281, 23 L. ed. 707; *Ruppert v. Brooklyn H. R. Co.,* 154 N. Y. 90, 47 N. E. 971; Starkie's Evidence, sec. 57; *Douglass v. Mitchell,* 35 Pa. 440; *People v. Kennedy,* 32 N. Y. 141; *Railroad Co. v. Henrice,* 92 Pa. 431, 434, 37 Am. Rep. 699; *Wald v. Railroad Co.,* 13 Ky. Law Rep. 853, 18 S. W. 850; *Chicago R. C. & P. Co. v. Rhoades,* 64 Kan. 553, 68 Pac. 58.)

Plaintiff's requested instruction No. 1 does not state the law fully or fairly, in that it lays especial stress and undue emphasis on certain portions of the state's evidence; that a considerable portion of it was couched in extremely argumentative language; that it contains an ingenious statement and comparison as to the relative value of direct and circumstantial evidence, and language as to the weight of evidence. (*People v. O'Brien,* 130 Cal. 1, 62 Pac. 297, 300; *In re Blake's Estate,* 136 Cal. 306, 89 Am. St. 135, 68 Pac. 827, 828; *People v. McNamara,* 94 Cal. 509, 29 Pac. 953, 954; *People v. Travers,* 88 Cal. 233, 26 Pac. 88; *People v. Keith,* 141 Cal. 686, 75 Pac. 304; *Goodwin v. State,* 96 Ind. 563; *Brady v. Commonwealth,* 11 Bush (Ky.), 282; *Harrison v. State,* 9 Tex. App. 407.)

When it appears after trial that a juror had beforehand prejudged the case, but had improperly withheld this fact before acceptance, or when asked as to his opinion on *voir dire* had given false answers, and such formation of opinion was unknown to the party at the time, a new trial will be granted. (Wharton Crim. Proc., sec. 844; *State v. Wright,* 112 Iowa, 436, 84 N. W. 541; *Jeffries v. State,* 74 Miss. 675, 21 So. 526; *Jordan v. State,* 119 Ga. 443, 46 S. E.

679; *State v. Giron*, 52 La. Ann. 491, 26 So. 985; *Fitzgerald v. People*, 1 Colo. 56; *Troxdale v. State*, 28 Tenn. 411; *Chartz v. Territory* (Ariz.), 32 Pac. 166.)

The reason for the rule is particularly strong when the evidence is conflicting and circumstantial. (*Hyman v. Eames*, 41 Fed. 676.)

D. C. McDougall, Attorney General, J. H. Peterson, O. M. Van Duyn, Assistants Attorney General, H. F. Ensign, Prosecuting Attorney, and Sullivan & Sullivan, for Respondent.

The long line of cases holding that preparation on the part of the accused for the commission of the crime is admissible are entirely applicable to this case. (*Bolling v. State*, 54 Ark. 588, 16 S. W. 658; *People v. McGuire*, 135 N. Y. 639, 32 N. E. 146; *People v. Williams*, 17 Cal. 142; *Simmons v. State*, 31 Tex. Cr. 227, 20 S. W. 573.)

"A witness may refresh his memory by referring to summary of his testimony given upon a former trial of the action in which his testimony is desired." (11 Ency. of Evidence, 145, note, and cases cited; 1 Greenleaf on Evidence, sec. 436; 50 Am. Digest, cc. 1132, 1133.)

Sec. 6078, Rev. Codes, was taken bodily from California and is the exact language of sec. 2047, Code Civ. Proc. of California, and has been construed in *People v. Durrant*, 116 Cal. 179, 48 Pac. 75. (See, also, 2 Jones, Law of Evidence, sec. 346; 17 Cyc. 787.)

"Evidence that shows that the accused has attempted to fabricate or procure false evidence .... is always admissible as showing a consciousness of guilt, and is of particular value where the incriminating evidence is mainly circumstantial." (Underhill on Crim. Ev., sec. 121.)

Plaintiff's requested instruction No. 1 was taken without the change of a material word from the instruction of the court in *People v. Anthony*, 56 Cal. 397. The same instruction was before the California court in the case of *People v.*

*Olsen,* 1 Cal. App. 17, 81 Pac. 676, and was specifically affirmed.

One or two *ex parte* affidavits are not sufficient to overcome the positive statement of a juror made on his *voir dire* examination that he has no opinion and has never formed nor expressed an opinion as to the guilt or innocence of the accused, when such juror is shown to have a good reputation for truth and veracity among his neighbors and acquaintances.   (*State v. Davis,* 6 Ida. 159, 53 Pac. 678.)

STEWART, J.—The appellant was tried and convicted of murder of the second degree.  A motion for a new trial was made and overruled.  This appeal is from the judgment and from the order overruling the motion for a new trial.

The evidence upon which appellant was convicted was wholly circumstantial, and the first question presented in appellant's brief is the contention that the evidence is insufficient to justify the verdict.  The evidence shows that Thomas Marren, the appellant, and Con. Ryan, the deceased, had for a number of years been residents on the Malad river, the appellant living on the north side and the deceased on the south side, and about a mile and a half apart.

On the morning of October 29, 1907, the deceased left home with his team and wagon for the purpose of going after logs.  In the evening, about dark, the team and wagon returned home with the body of the deceased on top of the load of logs, dead.  He was lying on his back and the entire top of his head was gone.  Blood stains were found along the route over which the wagon passed leading from the residence of Ryan back to the ford across the Malad river. At the ford and near the south bank of the river, the side upon which the deceased resided and the side reached by the team after crossing the river, were found pieces of skull and particles of brain matter, and there were other indications showing that the life of the deceased was taken at or

near the south bank of the river. No blood stains or remains were found on the north side of the river.

For a long time prior to October 29, 1907, the appellant and the deceased had had many disputes and quarrels over water. James Pierce testified that in April, 1907, the appellant came from Soldier and said he had met Con. Ryan at Soldier and said: "Con. was under the influence of liquor and that Con. abused him pretty bad up there, and he says, 'Wait until I get him out on the range all alone and I will fix him.'" W. P. Ellsworth testified that in May, 1907, he heard the deceased abuse the appellant in a blacksmith-shop at Soldier, and the appellant said to the deceased: "You bastard! I will kill you, Con.; if you don't go off and let me alone, I will kill you." Joshua Thurber testified that in July, 1907, in a conversation with Thurber about Ryan's share of water, the appellant said: "He told me not to take any notice of what he said—that he had no more right to the water than I did. He says a fellow could not do anything with him in these little justice courts; he said he would kill him only it would cost him more than the water was worth." Also on July 20, 1907, the appellant and the deceased met, when the appellant was in his wagon and had a rifle and said to the deceased: "Stand out there a piece and I will give you a fair show with your rifle," and the deceased said, "I dare you to shoot; I am not afraid of your gun," at which time one of the parties who was with the appellant cautioned the parties that there was no use quarreling, when the appellant turned to one of the other parties and said: "We will go home and I will be over to-morrow and settle it with a rifle." The appellant then stood up in his wagon and raised his gun in the direction of the deceased. No weapon was seen upon the deceased. Other conversations took place between the appellant and the deceased in which they talked about fighting. A. J. Butler testified that in the latter part of May, 1907, the appellant stated that he had been up to town (Soldier) and saw Ryan, and Ryan

abused him shamefully—worse than a dog—and the appellant said: "The little drunken sot; he should be killed. I would think no more of killing him than I would a dog."

Also that on the evening of October 28, 1907, he was at the residence of the appellant and when going across the field to look at some stock, the appellant asked the witness, "Have you seen Con. lately?" And the witness said, "Yes," when the appellant says, "What is the little son-of-a-bitch doing?" "I said he was hauling wood, and to-morrow will be the last load of wood to the canyon, and he was going to bring me a sack of grain in the morning, as I was going to the canyon to get out some telephone poles for him, which he did. I accompanied him to the canyon."

It also appears that for several weeks prior to October 29th, the appellant carried a rifle with him wherever he went.

It appears from the evidence that the section of country between the residence of the appellant and the deceased and the ford across Malad river and for some distance in the direction the deceased went on the morning of October 29th for wood, and the locality in which the appellant was engaged during the day of October 29th, in fixing fences about certain haystacks, was comparatively level, and that the residence of the deceased was clearly in view from the residence of the appellant, and that from the haystacks where the appellant was engaged in fixing fences during the day of October 29th, the route over which the deceased would pass in returning home was within plain view for some distance before the deceased would cross the ford, also the ford and the road leading from there to the deceased's house.

About ten minutes after 4 o'clock on the afternoon of October 29th, the wife of the deceased went out for the purpose of ascertaining whether she was able to see her husband returning home, at which time she saw an apparent object in the road which she took to be her husband's team, and at the same time she saw the appellant leave a certain haystack something like a mile and a half northeast of the

Malad ford and about a mile southeast of the appellant's residence.

Erik Anderson testified that he went to the appellant's residence about half-past 5 or a quarter to 6 on the evening of October 29th, unhitched his horses and tied them to the corral; that he did not see the appellant; that he looked to the south where he expected appellant, and around the fields and toward the river, but did not see him. He then did some chores and waited about a half hour. It commenced to get a little dusk when he got there at 5:30. He did not go into the house because it was locked, and sat down and rested in the blacksmith-shop, and while he was sitting there a gun popped and he saw the flash and jumped up and said: "What in damnation are you doing here? You better quit or you will kill the horses." And the appellant spoke up and said: "Is that you, Erik Anderson?" And the witness said, "Yes; is that you, Tom?" He said, "Yes, they are shooting at me; look out, don't come out here—they might kill you." "Then I didn't hear anything for a little while, then he said, 'Knocked the hat off me the first rattle.' I says, 'Can't you come in through the gate?' He says, 'No, I can't.' He sat down on a log at the bob sleds and after a while said he was all right. Then he had his gun." He also testified that there were six shots fired altogether; the flash was coming from the gate on the east; the second shot was a minute and a half or two after the first, then three pretty close together, but he did not see the flashes of those shots; that all the shots sounded the same; that Marren came through the gate and had a rifle with him; that the witness did not hear any other noises except the shots and Marren's hollering; that no other noise was heard outside of the gate; that when Marren came in, it was probably ten minutes or a quarter past 6; that after he went into the house and lighted the lamp, he asked Marren about the time and he looked at his watch and says, "Just half-past 6," and called attention to his hat. He said that the time he was out at the gate, they knocked the hat off him the first rattle; he said he

was pretty close to him and showed witness the hat. He spoke of one other shot through the coat, about halfway between the pocket and the corner, and after talking on a while, he said there was another hole down in his overalls. He sewed the hole in the hat up—there were two holes in it. The witness stayed there all night; got up the next morning about half-past 6 and the appellant was up about a half hour before that.

This witness further testified that on the morning after the shooting, he looked around over a couple of acres of ground where the appellant was, near the gate, when the shots were fired on the evening of the 29th, and that he discovered no tracks nor any rifle shells. A rifle was found at the appellant's residence after his arrest.

The physician who called to examine the body of the deceased testified that he saw the body at about 6:30 or 7 P. M., on October 29th; that the top of the deceased's head had been torn away and that the brain matter was loose and lying on the logs on the wagon; that there were blood stains around the head and on the double-trees and single-trees and on the logs in front of the body; that there were stains on the brake-rope and on one of the fore wheels; that in his opinion the deceased was killed by a modern high-power rifle of a caliber similar to 30-30, with a soft-nosed lead bullet and smokeless powder; that the effect of an expansive bullet or soft-nosed bullet under 50 yards is an explosive one; when fired into a closed box, as the skull is filled with a semi-fluid matter which almost fills it, the effect is not to penetrate but to explode the entire box, whether that be the skull or an inclosed box.

The evidence further shows that tracks were found in the road leading away from the ford which corresponded to the shoes worn by the appellant on October 29th. The evidence shows the distance between the defendant's house and the Malad ford was one and nine-tenths miles by the road. This, in main, was the evidence on the part of the state.

This evidence is not contradicted in any substantial part. We think this evidence sufficient to support the verdict. It

is true the evidence is wholly circumstantial, but from this evidence it clearly appears that Ryan was murdered, that appellant had the opportunity to commit such crime, and that a motive was shown why the appellant would commit such crime. Where circumstantial evidence is relied upon to prove guilt, it is sufficient to warrant a conviction when the evidence shows, first, the homicide; second, that the person charged had the opportunity to commit such murder; third, that a motive is shown for such killing, and the circumstances establishing these facts are so connected as to exclude every other rational hypothesis than that of guilt. But counsel for appellant very earnestly contend that the evidence is insufficient because it does not connect the appellant with the killing.

It appears from the evidence that Mrs. Ryan, the wife of the deceased, saw the appellant at about 4:10 in the afternoon at a hay-stack on the south side of the Malad river, and saw him going with a wagon toward the river bridge. This haystack was about a mile from the appellant's residence and the latter one and nine-tenths miles from the Malad ford where the killing took place. The appellant, then, would have had sufficient time to go from the haystack to his residence and put away his team and reach the ford and be there at 5:30, or thereabouts, the time when shots were heard in that direction and about the time the killing necessarily took place as shown by the time the deceased's team reached home, which was about 6 o'clock, and the time appellant reached home, which was 6 or 6:15. When the appellant came home he carried a rifle. This rifle was of the same caliber as the evidence shows would have produced the character of wound which caused the death of the deceased. It is true, the witnesses who heard the shots vary the time from nearly dark to dark, and the witness Anderson fixes the time when the appellant reached home at between 6 and 6:15. Under the circumstances of this case, the slight variation as to the time when the witnesses fix that they heard the shots and when the appellant reached home, could arise and be ex-

plained on a rational basis upon the theory that the same guide was not used by each for the determination of whether it was dark or nearly dark, or 6 or 6:15, and the exact time, under the peculiar circumstances, is not of so great importance as to cast a doubt whether the appellant was at the ford where the crime was committed, at the time such crime was committed. He could have been there notwithstanding the fact that the witnesses vary slightly as to whether it was dark or nearly dark, or 6 or 6:15, when he reached home, because each may have fixed a different standard as a basis for his conclusion as to whether it was dark or nearly dark and the particular time.

These facts, taken in consideration with the threats made by appellant against the deceased, hereafter referred to, we think are sufficient to connect the appellant with the killing.

Counsel for appellant also argue that motive was not shown, and that the ill-feeling existing between the deceased and the appellant was all on the part of the deceased.

It is apparent from the evidence in this case that the deceased and the appellant had had trouble and various disputes over water, and that threats were made by each against the other; but from the evidence which we have briefly set out, we are unable upon any reasonable hypothesis to explain away the evidence except upon the theory that a motive clearly existed in the mind of the appellant for the killing of Ryan. This argument might have some basis for the claim that the appellant did the act in self-defense, and that he was justified in taking the life of the deceased because of the threats made against him by the deceased, but there is no claim of self-defense in this action. The killing is not admitted, and in the absence of such defense, such threats and the difficulties that the deceased and the appellant previously had and the malice and ill-will existing, clearly establish a motive. We are unable upon any reasonable hypothesis to explain away this evidence, except as indicating the malice and ill-will on the part of the appel-

lant against the deceased and his desire and intent to have removed and to remove the deceased as a further cause of trouble.

It is next contended that the trial court erred in permitting the witness Butler to testify, that on October 28, 1907, he went to Marren's home, and before arriving there he heard two or three shots fired, and when he reached there, Marren was out at the east end of his house looking, he said, for a pocket-knife which he said he had dropped, and pointed to a stump and said, " 'Butler, how is that for shooting?' He continued looking for that knife. He said he wanted it to extract some shells from the six-shooter he had there, as the extractor was broken. He said he was going to repair it at a later date. We then started into the house and he had the six-shooter. He says, 'I used to knock a rabbit's head off with that gun nine times out of ten.' " The attorney general contends that this evidence was admissible because it showed preparation and plan of the appellant to commit the crime; while counsel for appellant contend that the evidence wholly fails to show any relation to the crime; that the appellant was practicing with a pistol and not with a rifle, the character of weapon with which the crime was committed, and that there was nothing in the acts of the appellant at the time to indicate any preparation or connection with the crime committed on the 29th. It is true that the evidence offered shows that the appellant was practicing with a weapon different in kind from that with which the crime was committed; yet there are circumstances surrounding the events that took place at the time which would warrant a jury in concluding that it was the intention of the appellant at that time, and a part of his plan, to take the life of the deceased with the weapon he was then practicing with, and that he was only prevented from carrying out this design or plan by reason of the disrepair of the six-shooter; and that the intention and plan to take the life of the deceased at that time had been formed, and it was proper to show such facts even though it was carried out by the use of a different kind of weapon than that used at ·

that time.   If the intent to kill existed, whether such intent was carried out by the use of a pistol or rifle was immaterial.

The appellant knew that the deceased was hauling wood, and took occasion on that day to inquire whether the deceased had been seen, and the inquiry, "What is the little son-of-a-bitch doing?" indicated very clearly that the appellant at that time was thinking of the deceased—had his mind on deceased—and that fact taken in connection with his practicing shooting and his remarks as to his perfect marksmanship are circumstances which would well warrant the jury in concluding that the intent was formed or was being formed at that time to take the life of the deceased; and the mere fact that it was not carried out with the identical weapon or the kind of weapon then in use would not render such evidence inadmissible.   If this shooting was in preparation for the killing, it was admissible and proper to be considered in determining the *animus* with which the act was done, and just what weight should be attached to such circumstances was for the jury to determine.   (*Bolling v. State*, 54 Ark. 588, 16 S. W. 658; *People v. McGuire*, 135 N. Y. 639, 32 N. E. 146; *People v. Williams*, 17 Cal. 142; *Simmons v. State*, 31 Tex. Cr. 227, 20 S. W. 573.)

Joshua Thurber, a witness for the state, upon direct examination testified that on the evening of October 29, 1907, he quit work about 6 o'clock and that it was about sundown—nearly sundown.   Afterward a recess of the court was taken and the witness was recalled and upon inquiry testified that he was a witness at a previous trial of said case, and counsel for the state said: "I hand you your testimony at the last trial as to whether it was light or dark, or how it was at 6 o'clock, and ask you after reading it if it refreshes your memory."   To this inquiry counsel for appellant objected because it was an attempt to refresh the memory of the witness by what he had testified to at a previous trial and not by any memorandum or other document made at the time, and for the further reason that it is an attempt to impeach and contradict the state's own witness.   This objection was over-

ruled and the witness was asked to read his testimony and
see if that refreshed his memory as to whether it was light
or dark, and answering in the affirmative, he was asked, "Now,
I will ask you when you quit work on the 29th of October,
1907, how it was as to being light or dark?" This question
was also objected to, because it was based upon the refresh-
ing of the memory from something which occurred or testi-
mony given in a previous trial and not by documents made
at the trial the testimony related to. This objection was
overruled and the witness answered, "It was dusk, or nearly
dusk, at that time in 1907." The witness was then asked if
he had any explanation to make as to how he happened to
say sundown. His reply was, "I will explain to the jury
that we have been quitting at 5 o'clock this year which was
earlier than it was last year—my reason for making the mis-
take in the time."

Counsel for appellant calls our attention to Rev. Codes.
sec. 6078, as follows: "A witness is allowed to refresh his
memory respecting a fact, by anything written by himself.
or under his direction, at the time when the fact occurred.
or immediately thereafter, or at any other time when the
fact was fresh in his memory, and he knew that the same
was correctly stated in the writing. . . . ." And contends
that, under the provisions of this statute, a witness cannot
refresh his memory by referring to evidence · given by him
at a former trial. This section is the same as sec. 2047 of
the Code of Civ. Proc. of the state of California. In the
case of *People v. Durrant,* 116 Cal. 179, 48 Pac. 75, the su-
preme court of that state had under consideration this sec-
tion of the California code and held:

"The witness would have the undoubted right to read his
testimony given upon the examination for the purpose of
refreshing his memory. (Code Civ. Proc., sec. 2047.) Such
a transcript may at least be regarded as a private memoran-
dum. (*Reid v. Reid,* 73 Cal. 206, 14 Pac. 781.) When a
witness called by a party fails to testify to matters pre-
viously within his recollection, or gives evidence in apparent
variance with that formerly given, it is not incumbent upon

the party producing the witness to wait for the assaults of the cross-examination to expose seeming inconsistencies and discrepancies. While he may not impeach his witness (saving under certain exceptional circumstances), he may with propriety refresh his recollection, to the end that the witness and his present evidence may both be put fairly and in their proper light before the jury. The answer above quoted affords a good illustration of this. The witness admits the discrepancy between his former and his present testimony, and candidly explains it as arising from a doubt created by his former cross-examination. There was here no impropriety and no injury to defendant.''

In the case of *People v. McFarlane*, 138 Cal. 481, 71 Pac. 568, 72 Pac. 48, 61 L. R. A. 245, the supreme court of that state again had under consideration sec. 2047 of the Code of Civ. Proc., and affirmed the case of *People v. Durrant*, *supra*, and after quoting the section, says: ''It was conceded at the trial that the transcript from which counsel read was a correct transcript of the witness' former testimony, and this court has held that such a transcript may at least be regarded as a private memorandum.'' This latter case, in so far as bearing upon this particular question, presents a state of facts almost identical with those presented in the case at bar. It will be observed that the questions asked the witness with reference to testimony given by him at a former trial, and to which objection was made, were not asked for the purpose of impeaching the witness by the introduction of the former testimony, nor were such questions asked for the purpose of identifying the former testimony with a view to introducing the same as evidence; but the questions merely directed the witness to the testimony given by him at a former trial and he was asked, after refreshing his memory by an examination of his former evidence, whether he was able, in consequence of such examination, to speak the facts with which he was once familiar, and if so, to state such facts.

In 1 Greenleaf, sec. 436, the author lays down the general rule as follows:

"Though a witness can testify only to such facts as are within his own knowledge and recollection, yet he is permitted to refresh and assist his memory, by the use of a written instrument, memorandum or entry in a book, and may be compelled to do so, if the writing is present in court. It does not seem to be necessary that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak to the facts from his own recollection. So, also, where the witness recollects that he saw the paper while the facts were fresh in his memory, and remembers that he then knew that the particulars therein mentioned were correctly stated. And it is not necessary that the writing thus used to refresh the memory should itself be admissible in evidence; for if inadmissible in itself as, for want of a stamp, it may still be referred to by the witness."

In vol. 1, sec. 758 of Prof. Wigmore on Evidence, may be found a quotation from Sir G. A. Lewin, note to *Lawes v. Reed*, 2 Lew. Cr. C. 152, as follows:

"If in truth the memory has been refreshed, and he is enabled in consequence to speak to facts with which he was once familiar, but which afterward escaped him, it cannot signify, in effect, in what manner or by what means these facts were recalled to his recollection. Common experience tells every man that a very slight circumstance, and one not in point to the existing inquiry, will sometimes revive the history of a transaction made up of many circumstances. . . . . Why, then, if a man may refresh his memory by such means out of court, should he be precluded from doing so when he is under examination in court?"

In the case of *McNeely v. Duff*, 50 Kan. 488, 31 Pac. 1061, the supreme court of Kansas states the rule as follows: "As we understand the rule, the witness may refresh his recollection by any book or memorandum containing the account, or so much of it as is sufficient to refresh his recollection, whether it is in such form that it be received in evidence or not, and then testify, if he has any independent recollection of the transaction."

In 11 Ency. of Evidence, in a note at page 145, the author says: "A witness may refresh his memory by referring to summary of his testimony given upon a former trial of the action in which his testimony is desired," and cites *Riordan v. Davis*, 9 La. 239, 29 Am. Dec. 442; *Watrous v. Cunningham*, 71 Cal. 30, 11 Pac. 811; *People v. Durrant*, 116 Cal. 179, 213, 48 Pac. 75. See, also, Jones on Evidence, 2d ed., sec. 287; 17 Cyc. 787.

It no doubt was the intention of the legislature in enacting the statute now under consideration to declare the general rule, and we are satisfied that the statute should be so construed and that a witness may refresh his memory by reading evidence given by him at a former trial, and after refreshing his memory, state the truth. The court, therefore, did not err in permitting the witness to refresh his memory by reference to the evidence given by him at a former trial, and upon refreshing his memory, to speak the truth.

It appears in the evidence of Erik Anderson, heretofore referred to, that when the appellant returned home at about 6 or 6:15 and just before Marren came up to the house, the witness heard shots fired outside of Marren's gate and saw the flash of some of these shots, and that Marren told him some one was shooting at him and that Marren showed him a hole in his hat and related how it occurred; and it is contended on the part of the appellant that the court erred in admitting this evidence. It is the contention of the attorney general that this evidence was admissible because it shows that the shots were fired by the appellant for the purpose of fabricating testimony. This shooting took place within about thirty minutes after the time the evidence shows Ryan was killed, and the appellant had in his possession at the time such shooting took place a rifle. Appellant told Anderson some one was shooting at him, and made no effort to trace such parties or discover where they had gone or from whence the shots came, and, in fact, made no effort nor asked Anderson to make any effort to discover who was doing such shooting, but went into the house and commented upon the fact of the shooting and stated that "They knocked

the hat off me the first rattle," and proceeded to mend the hole in his hat with perfect indifference as to the identity of the persons who fired such shots. From these circumstances and facts, the attorney general argues that the appellant himself did such shooting for the purpose of creating the inference that the same person who killed Ryan also attempted to kill the appellant, and because the appellant was fired upon and an effort made to take his life, the presumption could be indulged in that the person who fired such shots also fired the shots or shot which took the life of Ryan. We are inclined to think that there is much force in the argument of the attorney general with reference to this shooting and the circumstances attending the same, and that the court did not err in admitting such evidence as tending to show a guilty mind on the part of Marren and a plan to divert attention from his connection with the killing of Ryan, for consideration by the jury and to be given such credit as, in their judgment, it was entitled to. While this evidence was not admissible as a part of the *res gestae,* yet it was admissible as tending to show the state of mind of Marren after the commission of the homicide and a plan and purpose on his part to manufacture and fabricate evidence for the purpose of diverting attention from his connection with the crime to that of placing the responsibility upon some other unknown person.

Underhill on Criminal Evidence, sec. 121, announces the rule as follows: "Evidence that shows that the accused has attempted to fabricate or procure false evidence . . . . is admissible as showing a consciousness of guilt and is of particular value when the incriminating evidence is mainly circumstantial." (See, also, Wigmore on Evidence, secs. 273, 278.)

Counsel for respondent argue that even if it be conceded that this rule is correct, yet before guilty conscience can be inferred from false statements or fabricated acts, it must be proven that such statements are false and the acts fabricated and that such falsity or fabrication cannot be left to conjecture or inference. This may be conceded, but still the

question as to whether such statements are false and the acts fabricated, are matters which must be left to the jury for determination, and if the jury are of the opinion that the evidence offered is fabricated, then they may take such fact into consideration as tending to prove a guilty conscience. If, however, the jury are of the opinion that the statements are not false or the facts fabricated, then no inference of guilty conscience can arise out of such evidence. It is not necessary in order to render such evidence admissible that the falsity or fabrication be proven by direct evidence; such falsity or fabrication may be determined from the circumstances and be proven as any other fact may be proven by circumstantial evidence. In this case the jury may have concluded that because of Marren's indifference about the shooting and his discussion of the same and his conduct, it was an indication that his statements with reference to the shooting were false and that he created the appearances by his own acts, and therefore showed a guilty conscience. We are not prepared to say, after reviewing this evidence, that the jury would not have been warranted in reaching this conclusion. The court did not err in admitting this evidence.

The trial court gave to the jury the following instruction: "The jury are instructed that there are two classes of evidence, recognized and admitted in the courts of justice, upon either of which juries may lawfully find an accused guilty of crime. One is direct or positive testimony of an eye witness of the commission of the crime, and the other is proof by testimony of a chain of circumstances pointing sufficiently strong to the commission of the crime by the defendant, and which is known as circumstantial evidence. *Such evidence may consist of admissions by the defendant, threats previous to the commission of the crime, tending to show a hostility on his part against the deceased, and, in short, any acts, declarations or circumstances admitted in evidence tending to connect the defendant with the commission of the crime. There is nothing in the nature of the circumstantial evidence that renders it any less reliable than*

*any other class of evidence. A man may as well swear falsely to an absolute knowledge of the facts, as to a number of facts, from which, if true, the facts on which the guilt or innocence depends must inevitably follow. No human testimony is superior to possible doubt and all that is required is this:* If under the foregoing rule the testimony is sufficient to convince you as a reasonable man, beyond a reasonable doubt, that the defendant did commit the act charged, *although the fact may be in a degree surrounded by a doubt,* then I charge you it is your duty to convict."

Counsel for appellant contend that the italicized portion of this instruction is erroneous, because it lays special stress and undue emphasis on certain portions of the state's evidence; that it is argumentative; that it contains a comparison as to the relative value of direct and circumstantial evidence and the weight of evidence. This instruction is an exact copy of an instruction considered by the supreme court of California in the case of *People v. Anthony,* 56 Cal. 397, with the exception of one word, to wit, in the instruction in the Anthony case the court used the word "rules" while in the present case the court uses the word "rule"; and it is contended that this change gives a different interpretation than was approved by the supreme court of California in the Anthony case, but this change we consider of no consequence, as the jury would not be likely to confine their consideration to the instruction alone in determining the rule, especially if other instructions bearing upon the same subject were also given, and in the case at bar other instructions were given upon the subject of circumstantial evidence. In the case of *People v. Olsen,* 1 Cal. App. 17, 81 Pac. 676, the court of appeals of California approved the latter part of said instruction which says, "although the act may be surrounded in a degree by a doubt, then I charge you that it is your duty to convict." We believe the following portion of said instruction should not have been given, as it indulges in an argument as to the relative value of direct and circumstantial evidence: "There is nothing in the nature of the circumstantial evi-

dence that renders it any less reliable than any other class of evidence. A man may as well swear falsely to an absolute knowledge of the facts, as to a number of facts from which, if true, the facts on which the guilt or innocence depends must inevitably follow. No human testimony is superior to possible doubt and all that is required is this.''

Circumstantial evidence in criminal cases is the proof of such facts or circumstances connected with or surrounding the commission of the crime charged as tends to show the guilt or innocence of the accused, and these facts and circumstances when taken all together must be sufficiently conclusive as to convince the jury beyond a reasonable doubt of the guilt of the defendant; and if the facts and circumstances shown by the evidence are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury to convict. The law demands a conviction wherever there is sufficient legal evidence to show the defendant's guilt beyond a reasonable doubt, and circumstantial evidence is legal evidence. The statement, however, in the instruction that ''There is nothing in the nature of the circumstantial evidence that renders it any less reliable than any other class of evidence,'' and that ''A man may as well swear falsely to an absolute knowledge of the facts, as to a number of facts from which, if true, the facts on which the guilt or innocence depends must inevitably follow,'' is not the statement of a legal proposition, but is an argument of the relative value of circumstantial evidence as compared with direct or positive evidence. It is proper for counsel to argue to the jury whether or not the evidence is sufficiently strong when circumstantial to authorize a conviction, but it is not proper for the court to enter into a discussion as to the weight of any specific class of evidence or the effect which should be given to the evidence by the jury as compared with any other class of evidence. Under our system the jury are the judges of the facts, the credibility of witnesses, and the weight to be given to testimony, and the court in instructing the jury should confine the instruc-

tion to a statement of the law applicable to the facts of the particular case. Rev. Codes, sec. 7886, provides: "In charging the jury the court must state to them all matters of law necessary for their information." Issues of fact, under our system of jurisprudence, are left to the determination of the jury where jury trial is had. (Rev. Codes, sec. 7885.) When, therefore, the court comments upon or argues the relative weight of circumstantial evidence as compared with positive evidence, the instruction becomes an argument as well as invades the province of the jury and is erroneous. (*People v. Fong Ching,* 78 Cal. 169, 20 Pac. 396; *People v. Travers,* 88 Cal. 233, 26 Pac. 88; *Kaufman v. Maier,* 94 Cal. 283, 29 Pac. 481, 18 L. R. A. 124; *People v. McNamara,* 94 Cal. 509, 29 Pac. 953; *People v. Vereneseneckockockhoff,* 129 Cal. 497, 58 Pac. 156, 62 Pac. 111; *People v. O'Brien,* 130 Cal. 1, 62 Pac. 297; *In re Blake's Estate,* 136 Cal. 306, 89 Am. St. 135, 68 Pac. 827.)

In the case of *People v. Vereneseneckockockhoff,* 129 Cal. 497, 58 Pac. 156, 62 Pac. 111, *supra,* the supreme court of California had occasion to review the principle of incorporating in instructions comments upon the relative strength of different species of evidence, and this opinion was later approved in the case of *People v. O'Brien,* 130 Cal. 1, 62 Pac. 297, and in the latter case, after quoting an instruction objected to, the court says: "This instruction is obviously 'a . . . . charge to the jury as to the relative value of direct and circumstantial evidence.' It therefore comes within the principle of the decision laid down in *People v. Vereneseneckockockhoff,* 129 Cal. 497 [58 Pac. 156, 62 Pac. 111], lately decided, and must be regarded as in conflict with section 19, article 6, of the constitution. The instruction is, indeed, somewhat different from that commented on in the case cited, and possibly, in some respects, not so objectionable; but it is none the less in conflict with the rule there laid down; which is that 'the court cannot argue to the jury the relative importance of evidence, except as that is settled by some rule of law'; and that 'the law declares nothing as to the relative probative force' of the two species of evidence."

There is no provision in the constitution of this state similar to sec. 19, art. 6, of the constitution of California. That section reads as follows: "Judges shall not charge juries with respect to matters of fact but may state the testimony and declare the law." But we have the provision in Rev. Codes, sec. 7886, which requires the court in charging the jury to state to them all matters of law necessary for their information, and this same provision is found in the California Penal Code, sec. 1127, and in commenting on the provisions of the California code as applied to a particular instruction, the supreme court of that state in *People v. Barney*, 114 Cal. 554, 47 Pac. 41, said: "The instruction stated no rule of law but was simply argumentative as to the uncertainties and dangers attending this class of cases, in consequence of which convictions will sometimes be wrongly had and sometimes the guilty will go free. In charging the jury, the court must state to them all matters of law necessary for their information. (Pen. Code, sec. 1127.) But it should not go further and comment upon the facts."

We think the latter portion of the instruction, "Although the fact may be in a degree surrounded by a doubt," should not have been given to the jury. This statement could only have a tendency to confuse the meaning of "reasonable doubt" as defined in other instructions and could in no way aid the jury in reaching a verdict. In fact, all of the objectionable matter to which we have directed our attention could only have a tendency to mystify the case, and create a doubt in the minds of the jurors as to weight of circumstantial evidence and the doubt which would justify an acquittal. The court in instructing the jury should state propositions of law concisely and intelligibly so that the jury may understand, without indulging in any fine-spun theories, as to what the law is, applicable to the facts of the particular case.

There is another matter in connection with the instructions as they appear in the record which we think it proper to call attention to, in view of the fact that in some jurisdictions in this state there has grown up a practice by which the court, in giving instructions to the jury, will read to them what is

denominated "The Court's Instructions," and then read to them instructions given at the request of the plaintiff or the defendant. All instructions given to the jury should be instructions by the court, and the court should in no way indicate to the jury whether the instructions given are instructions given upon the court's own motion or at the request of either the plaintiff or the defendant, as, under the statute, it is the duty of the court to charge the jury, not particularly because requested by either plaintiff or defendant, but because the charge embraces the law applicable to the particular facts of the case. For the purpose of reserving exceptions, the court must indicate what instructions were requested by the plaintiff or defendant, but no intimation should be given to the jury that any particular instruction was given either at the request of the plaintiff or the defendant.

Although the instruction referred to contains matter which should not have been given to the jury, we are, however, of the opinion that the appellant could have been in no way prejudiced by the giving of such instruction. Other instructions were given to which no exception was taken, which clearly charged the jury with reference to circumstantial evidence; and not only that, but the evidence in this case is so clear and convincing of the guilt of the appellant that the jury could in no possible manner have been influenced to return a verdict of guilty by the objectionable matter contained in this instruction; and from the evidence, the jury could not, without a violation of their oaths, fail to have found the defendant guilty, and because of this, the defendant could not have been prejudiced by the giving of such instruction.

Rev. Codes, sec. 8070, admonishes this court: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." And again, Rev. Codes, sec. 8236: "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his

prejudice in respect to a substantial right.'' The substance of these statutory provisions is that a new trial ought never to be granted, notwithstanding some mistake or even misdirection by the judge, provided the revisioning court 'is satisfied that justice has been done and that upon the evidence no other verdict could properly have been found. (*Johnson v. State,* 14 Ga. 55; *State v. Gut,* 13 Minn. 341; *People v. Scott,* 6 Mich. 287; *Ballard v. State,* 31 Fla. 266, 12 So. 867; *People v. Taggart,* 1 Cal. App. 423, 82 Pac. 396.)

In the latter case the court very aptly observes: ''I have no doubt, therefore, that the instruction is erroneous, and that ordinarily the error would be material. But in the present case the circumstantial evidence of defendant's guilt was, if · not absolutely conclusive, at least 'satisfactory,' in the sense of the term as defined by the code—that is to say, it was such as 'ordinarily produces moral certainty or conviction in an unprejudiced mind' (Code Civ. Proc., secs. 1825, 1826); and it stood entirely uncontradicted. Assuming, therefore (as we must), that the jury was composed of men at once unprejudiced and of average common sense and judgment, we are justified, under the authorities, in believing (as we do) that the result would not have been different had the instruction been omitted.'' And in the case of *State v. Bond,* 12 Ida. 424, 86 Pac. 43, this court, after quoting from a number of authorities, approves the rule adopted in California that while some of the instructions may be subject to criticism and may not state the law with precise accuracy, yet, if taken as a whole, they are substantially correct and the jury could not have been misled to the prejudice of the defendant, the giving of such erroneous instruction is not ground for reversal.

It is next contended that the trial court should have granted a new trial upon the showing made of the disqualification of the juror Charles H. Smith. Upon his *voir dire* this juror testified that he had not formed or expressed an opinion as to the guilt or innocence of the defendant, and that his mind was free from any opinion, and that he did not entertain any feeling of bias or prejudice for or against the defendant.

Upon the hearing of the motion for a new trial, four differ-
ent affidavits were filed, in each of which the affiant swore
that he had heard the juror Smith express an opinion, in·
different forms, of his belief in the guilt of the appellant.
Counter-affidavits were filed by Smith denying these state-
ments and affidavits made by a number of persons who had
been acquainted with Smith for a long period of time and
who stated that he was a man of good standing in the com-
munity and that his general reputation for truth, veracity,.
honesty and integrity was good. An affidavit was also filed,
made by one John Varcoe, who was a juror in the trial of
said cause, and who made oath that during the deliberations·
of said jury the said juror Smith manifested no bias or preju-
dice against the appellant and was actuated by high motives,
fairness and justness in his consideration of the case, and
acted with impartiality; and that during the deliberations of
the jury three ballots were taken, the first resulting in a vote
of ten for conviction and two for acquittal and that Smith
and Varcoe were the two jurors who voted for acquittal; that
upon the second ballot on the basis of murder in the second
degree, the result was eleven for conviction and one for ac-
quittal and that the juror Varcoe cast said vote for acquittal;
that the third ballot resulted in a unanimous verdict of mur-
der in the second degree; that Smith at no time cast a ballot
in favor of murder in the first degree. An affidavit was also·
filed by three other persons who served as jurors in the trial
of said cause, and who made oath that Smith had no bias
or prejudice and was actuated in the discussion and deter-
mination of the cause by the highest motives, fairness and
justice and with strict impartiality. The attorney general
contends that a showing of disqualification of a juror is not
a ground for a new trial, under the provisions of the statute,.
and for that reason alone the court did not err in refusing
to grant a new trial. Counsel for appellant, in answer to this·
contention, claims that while this specific ground may not be·
mentioned in the statute enumerating grounds for a new trial,
yet, that it is sufficient under the constitution to authorize;

and require the granting of a new trial, and that a showing
of the disqualification of a juror upon motion for a new trial
is such misconduct upon the part of the juror as denies to
the defendant a constitutional trial; and that the only method
by which such disqualification, discovered after the conclu-
sion of the trial, can be presented to the court for review and
relief obtained by the accused is upon a motion for a new
trial.

It may be conceded that the granting of a new trial is:
purely a statutory proceeding, and under the authorities a
new trial should not be granted unless the grounds assigned
are within the provisions of the statute. It may be ques-
tioned, however, whether a defendant has been given the fair
and impartial trial guaranteed to him by the constitution
where a juror refuses to disclose his prejudice or bias upon his
*voir dire* and causes his acceptance as a juror by falsifying as
to the formation and expression of an opinion and whether
such facts are not sufficient, under the constitution and the
statute, to entitle such person to a new trial. The view, how-
ever, we take of the showing made makes it unnecessary to
determine this question at this time. Where a juror has
fairly answered questions upon his *voir dire,* and it is shown
that he is a person of good repute for truth and veracity, and
the qualification of such juror is attacked after the trial by
affidavits tending to show that the juror had formed and ex-
pressed an opinion of the guilt or innocence of the defendant
prior to his being accepted as a juror, the showing should be
clear and satisfactory and leave no reasonable doubt as to the
falsity of the juror's statements upon his *voir dire.* (*State
v. Davis,* 6 Ida. 159, 53 Pac. 678.) We approve what was said
by this court in that case, as follows:

"When we consider that the affidavits tending to show such
declarations are hearsay evidence, based on the recollection
of the affiants as to what was said in a conversation that
occurred months before the affidavit was made, and which
conversation was probably not fully understood, or misunder-
stood, or perhaps not remembered correctly, we think the

impeaching affidavits insufficient to overcome the positive statements of the jurors, strengthened by the testimony of divers witnesses showing good reputation for truth and veracity on the part of the jurors. Experience teaches us that the memory of man is a frail thing. We hear a statement to-day, and to-morrow, perhaps, are unable to recall it in the exact language of the declarant. Then, again, by failing to catch one word of a sentence, we get an idea entirely different from that intended by the speaker. . . . . It would be a dangerous practice to establish the rule that the verdict of a jury, which is fully sustained by the evidence, should be set aside on the ground that one or two *ex parte* affidavits are presented to the effect that one of the individual jurors had expressed an opinion prior to the trial to the effect that the accused is guilty, but which statement is denied by the juror, who is proven to be a man of good reputation for truth and veracity.'' (See, also, *State v. Levy,* 9 Ida. 483, 75 Pac. 227.)

It is the common experience of everyone who has had much to do with criminal trials and criminal procedure that it is not at all difficult, especially after a conviction has been secured, to find some person who is ready and willing to make affidavits impeaching the character, fairness and impartiality of some juror who served in the trial of said cause or the trial generally. It is to be regretted that such is the case, yet it must be admitted to be true, nevertheless. To accept such affidavits made *ex parte* and without opportunity to interrogate the person making the same with reference to the circumstances surrounding the alleged statement against the positive denial of the juror attacked, and whose reputation for truth and veracity is clearly established, unless the showing is clear and satisfactory, would be to open the door to an easy method for securing a new trial in criminal cases and subject the verdict of a jury to assaults which would render such verdict of very little force or effect. To entitle a person convicted of an offense to a new trial on the ground of disqualification of a juror, the showing should be clear and conclusive, and the trial court should be clearly satisfied that the

defendant has been denied the impartial trial guaranteed to him by the constitution.

In this connection, it is also claimed that the trial court erred in considering the affidavits made by jurors as to the conduct of the juror Smith while the jury was deliberating. In the case of *Bernier v. Anderson,* 8 Ida. 675, 70 Pac. 1027, this court held that the affidavit of a juror may be considered to sustain the verdict, but not to impeach it except where the verdict was the result of a determination by chance. We are not aware of any reason why this rule should not apply to this case and why it is not proper, where the verdict of a jury is attacked because of the bias or prejudice of a juror, to permit affidavits to be made by other jurors showing the conduct and acts of the juror attacked while deliberating upon the case and the fairness and impartiality of the juror's conduct. Such proof tends to refute the charge that the juror was biased, and tends to support his denials of having made statements before the trial expressing opinions of the guilt or innocence of the accused. The trial court did not err in considering such affidavits.

We find no error in the record and the judgment is affirmed.

Sullivan, C. J., concurs.

AILSHIE, J., Concurring.—It must be conceded that errors were committed in the trial of this case. I do not think, however, that they render it necessary to reverse the judgment. It is quite apparent from the whole record that substantial justice has been done in the case, and the errors that have been committed and which have received consideration in the opinion by Justice Stewart do not appear to have prejudiced any of the rights of appellant.

I find myself unable to agree with what is said in the majority opinion with reference to the witness Thurber refreshing his memory from an examination of the testimony given by him at a previous trial of the same case. I particularly disagree with the holding of the court to the effect that evidence

given by a witness upon the trial of a cause and taken by the shorthand reporter comes within the purview and meaning of section 6078 of the Rev. Codes, and is entitled to be classed as memoranda "written . . . . under his direction at the time when the fact occurred or immediately thereafter, or at any other time when the fact was fresh in his memory and he knew that the same was correctly stated in the writing." Such a holding is not justified by the language employed in the statute. To say that notes taken by a shorthand reporter on the trial of a case are entitled to be classed as private memoranda made under the direction of the witness, is indeed a far-reaching and dangerous rule. Such a rule, in my judgment, would in many cases endanger both a man's liberty and his property, and would furnish a shield for the production of false testimony upon subsequent trials, rather than a safeguard for eliciting the truth. In the first place, the court reporter is an officer of the court, and he makes his notes, not under the direction or control or sanction of the witness, but under the specific direction of the law. His oath as stenographer or court reporter is his official oath, but it in no way lends the sanction of an oath to the facts reported. The witness does not give his statement to the stenographer but to the court and jury. In order for a statement taken under his direction to be used for reference and to constitute a private memorandum, the statute says the witness must have known at the time it was taken down "that the same was correctly stated in the writing." The witness has no way of knowing that the stenographer has correctly stated what he has said. The witness is unable to read it himself, and the law does not require the stenographer to read it over to the witness, and indeed it is never done. Besides, the writing as it was taken in shorthand is not what is presented to the witness, but the written transcript made weeks or months thereafter, and in the absence of the witness, is what is used to refresh the memory of the witness.

The cases cited in the majority opinion do not appear to me to be in point, and I do not believe they sustain the rule in support of which they are cited. *People v. Durrant,* 116 Cal.

179, 48 Pac. 75, from which the opinion in this case quotes, was not a parallel with the case at bar.   There the deposition that was used to refresh the memory of the witness was one that had been taken at a preliminary examination in the same case.   The opinion says: ''For the purpose of refreshing his memory, the district attorney, over objection and exception by the defense, was permitted to read the following question and answer from the testimony of the same witness upon the preliminary examination in the police court.''   Now, there can be no similarity between a deposition taken at a preliminary examination and the stenographer's report of testimony given by a witness on the trial of the case.   In the first place, the statute specifically requires, and that is true in California as well as under our statute, that the deposition ''must contain the questions put to the witness and his answers thereto, each answer being distinctly read to him as it is taken down, and being corrected or added to until it conforms to what he declares is the truth.''   (Sec. 7576, Rev. Codes.)   The statute further provides that the witness shall subscribe his name to the deposition given at a preliminary examination.   Under these conditions the deposition given by a witness at a preliminary examination is clearly a memorandum made under his direction and, in the language of the statute, he must have known ''that the same was correctly stated in the writing.''   None of these reasons apply to evidence given by a witness on the trial of a case in the district court.   The quotation from the Durrant case, which is contained in the majority opinion in this case, cites *Reid v. Reid,* 73 Cal. 206, 14 Pac. 781, as supporting the rule announced in that case.   An examination of *Reid v. Reid* will at once disclose that it does not hold as was announced in the Durrant case.   In the Reid case it was sought to contradict the witness who had testified, by introducing the stenographer's transcript of evidence the witness had given on the same subject in another action.   The stenographer's transcript was certified ''to be a true and correct transcript from my shorthand notes taken in the trial of said cause.''   The court held that the transcript could not be used and did not fall within the rule prescribed by the statute.

The stenographer was not called to identify the transcript or to testify that it correctly stated what the witness had testified to. The court says: "If the reporter had been called and had testified on his examination in chief that the transcript was correct, it would have to be taken at that stage as *prima facie* correct. But the opposite party would have had the right to cross-examine him, before proceeding further," etc. It then proceeds to hold that if the court reporter had testified to the correctness of the transcript, it would then constitute a "private memorandum," as to the stenographer, of what *he* had done, but it nowhere holds that such transcript would have been a "private memorandum" as to the witness who testified. It is further said: "This being the case, the transcript could at most have been used to refresh the memory of the witness." "The witness" mentioned and referred to in this sentence is the stenographer or court reporter, and not the witness who had given the testimony at the previous trial. *People v. McFarlane,* 138 Cal. 481, 71 Pac. 570, 61 L. R. A. 245, rests solely on the authority of *Reid v. Reid* and *People v. Durrant,* and gives no other reason whatever for the holding.

I am satisfied that the evidence given by a witness in course of a previous trial and taken by the court reporter does not fall within the purview of sec. 6078, Rev. Codes. It has been held by many courts that such a transcript should not be used for refreshing the memory of a witness. (*Bashford v. People,* 24 Mich. 244; *Brown v. State,* 28 Ga. 211; *Velott v. Lewis,* 102 Pa. 326; *Commonwealth v. Phelps,* 11 Gray (77 Mass.), 73; *Morris v. Lachman,* 68 Cal. 109, 8 Pac. 799; *Putnam v. United States,* 162 U. S. 687, 16 Sup. Ct. 923, 40 L. ed. 1118.)

The question which confronts us in this case is not an inquiry as to what is the general rule, independent of statute, to be applied in a case like this, but is rather a construction of sec. 6078 of our code. We are not asked to say what the law ought to be, but rather what the legislature has written into the law in this state. The language of the statute is plain and simple, and I submit that by no reasonable analysis

or interpretation can this statute be so construed as to cover a case like the one at bar.

In the case at bar, I do not think the fact that the witness was allowed to read an answer given by him on a previous trial of the same case was in any respect detrimental to the defendant. The witness did not pretend on either trial to have stated the time of day accurately or as recorded by a timepiece, but merely made an estimate of the time. His explanation as to how he determined the time was before the jury, as well as the uncertainty of his memory and the defendant had the opportunity of cross-examining the witness touching his previous testimony as well as with reference to his memory of the time as he fixed it on the last trial. It was too indefinite and carried too great a latitude to believe that the jury rested a conviction on this change of testimony made after reading in their presence a transcript of the evidence given by the witness at a former trial.

Upon a view of the whole record, I concur in affirming the judgment.